**UNITED STATES of America,
Plaintiff(s),**

v.

**George WILLIAMS, Neil Chapple,
Defendant(s).[1]**

**Case No. 09–20224.**

United States District Court,
E.D. Michigan,
Southern Division.

March 8, 2010.

1. Defendant George Williams was indicted along with ten co-defendants: Brandon Williams, Nancy Williams, Yolando Young, Ernest Larry Adams, Webb Smith, Neil Chapple, Gregory Palmer, Nathaniel Darryl Williams, Anthony Richardson, and Katrina Lyons.

Wayne F. Pratt, U.S. Attorney's Office, Detroit, MI, for Plaintiff(s).

***ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED OR DERIVED FROM ILLEGAL INTERCEPTION OF WIRE COMMUNICATIONS***

VICTORIA A. ROBERTS, District Judge.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background

Defendant George Williams is charged with: (1) Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1); (2) Health Care Fraud, in violation of 18 U.S.C. § 1347; (3) Unlawful Payments, in violation of 42 U.S.C. § 1320a–7b; (4) Possession with Intent to Distribute Controlled Substances–Cough Syrup with Codeine, in violation of 21 U.S.C. § 841(a)(1); and (5) Possession with Intent to Distribute Controlled Substances–Oxycodone, in violation of 21 U.S.C. § 841(a)(1).

In the General Allegations section of the Indictment, the Government alleges that Williams organized and operated a purported health care business under the name Quick Response Medical Professionals, P.C. ("QRMP"). Williams recruited

fake patients to see doctors employed by QRMP. Most of the patients were scheduled for doctor visits by co-Defendant Yolando Young, who instructed the patients to ask for prescriptions for drugs with a high street value, such as OxyContin 80mg, Xanax, Viccodin, Viccodin ES, and cough syrup containing codeine. QRMP employees retained the prescriptions. The fake patients were paid up to $220 in cash for their time and use of their Medicare card for billing purposes.

Williams had the prescriptions filled at various cooperating pharmacies, including Eastside Discount Pharmacy and Westside Discount Pharmacy. He paid cash for the drugs, and co-defendants Ernest Adams and Webb Smith delivered the drugs to distributors in exchange for money.

**B. August 5, 2008 Wiretap Application, Affidavit, and Order; and, September 5, 2008 Extension Application, Affidavit, and Order**

**1. August 5, 2008 Wiretap Application, Affidavit, and Order**

On August 5, 2008, an Assistant United States Attorney ("AUSA") for the Eastern District of Michigan, submitted an Application for an Order Authorizing the Interception of Wire Communications To and From Cellular Telephone Number 313–647–6583, which was used by Young.

The Application was supported by an Affidavit from Special Agent Christopher Dziedzic ("SA Dziedzic") of the Drug Enforcement Administration in Detroit, Michigan.

The AUSA sought:

authorization to intercept wire communications of YOLANDO VONALDO YOUNG, a/k/a "Yolanda"; GEORGE KEVIN WILLIAMS, a/k/a Kevin Williams, George (no middle name) Williams, Keith Smith and Rick Williams; ANTHONY RICHARDSON; BRANDON DAVID WILLIAMS;

GREGORY LEE PALMER; QUICK RESPONSE MEDICAL PROFESSIONALS; LOUIS RAY BELL; ERNEST LARRY ADAMS; ELEANOR MANIQUIS; EASTSIDE DISCOUNT PHARMACY and others as yet unknown ... concerning offenses ... involving (a) the distribution and possession with intent to distribute narcotic controlled substances, in violation of [21 U.S.C. § 841(a)(1) ]; (b) the use of communications facilities in commission of narcotics offenses, in violation of [21 U.S.C. § 843(b) ]; (c) attempts and conspiracies to commit the aforementioned crimes, in violation of [21 U.S.C. §§ 846 and 963]; (d) money laundering and conspiracy to commit money laundering, in violation of [18 U.S.C. §§ 1956 and 1957]; and (e) aiding and abetting the aforementioned crimes, in violation of [18 U.S.C. § 2].

An Order authorizing the interception was signed by a United States District Judge for the Eastern District of Michigan on August 5, 2008.

**2. September 5, 2008 Extension Application, Affidavit, and Order**

On September 5, 2008, the AUSA submitted an Application for an extension of the August 5, 2008 Order. The Application was supported by an Affidavit from SA Dziedzic. SA Dziedzic's Affidavit incorporates by reference his Affidavit dated August 5, 2008.

The AUSA sought:

authorization to intercept wire communications of YOLANDO VONALDO YOUNG, a/k/a "Yolanda"; GEORGE KEVIN WILLIAMS, a/k/a Kevin Williams, George (no middle name) Williams, Keith Smith and Rick Williams; ANTHONY RICHARDSON; BRANDON DAVID WILLIAMS; GREGORY LEE

PALMER; QUICK RESPONSE MEDICAL PROFESSIONALS; LOUIS RAY BELL; ERNEST LARRY ADAMS; NATHANIEL DARYL WILLIAMS; ERIN BETHANY WILLIAMS; NANCY ROCHELLE WILLIAMS; HENRY LEE MILLER; TINA MARIE HOLLOWAY; ELEANOR MANIQUIS; EASTSIDE DISCOUNT PHARMACY and others as yet unknown ... concerning offenses ... involving (a) the distribution and possession with intent to distribute narcotic controlled substances, in violation of [21 U.S.C. § 841(a)(1)]; (b) the use of communications facilities in commission of narcotics offenses, in violation of [21 U.S.C. § 843(b)]; (c) attempts and conspiracies to commit the aforementioned crimes, in violation of [21 U.S.C. §§ 846 and 963]; (d) money laundering and conspiracy to commit money laundering, in violation of [18 U.S.C. §§ 1956 and 1957]; (e) paying Medicare beneficiaries to sign for unnecessary medical services and utilizing Medicare prescription drug coverage to pay for prescription narcotic medications not provided to the beneficiary, in violation of [18 U.S.C. § 1347]; and (f) aiding and abetting the aforementioned crimes, in violation of [18 U.S.C. § 2].

An Order authorizing the extension was signed by a United States District Judge for the Eastern District of Michigan on September 5, 2008.

### C. October 7, 2008 Application, Affidavit, and Order; and, November 6, 2008 Extension Application, Affidavit, and Order

#### 1. October 7, 2008 Application, Affidavit, and Order

On October 7, 2008, the AUSA submitted an Application for an Order Authorizing the Interception of Wire Communications To and From Cellular Telephone Numbers 313–768–6117 and 313–399–6050, which were used by Williams.

The Application was supported by an Affidavit from SA Dziedzic. SA Dziedzic's Affidavit incorporates by reference his Affidavits dated August 5, 2008 and September 5, 2008.

The AUSA sought:

authorization to intercept wire communications of GEORGE KEVIN WILLIAMS, a/k/a Kevin Williams, George (no middle name) Williams, Keith Smith and Rick Williams; YOLANDO VONALDO YOUNG, a/k/a "Yolanda"; ANTHONY RICHARDSON; BRANDON DAVID WILLIAMS; GREGORY LEE PALMER; QUICK RESPONSE MEDICAL PROFESSIONS; LOUIS RAY BELL; ERNEST LARRY ADAMS; ELEANOR MANIQUIS; MILAGROS EBREO; EASTSIDE DISCOUNT PHARMACY and others as yet unknown ... concerning offenses ... involving (a) the distribution and possession with intent to distribute narcotic controlled substances, in violation of [21 U.S.C. § 841(a)(1)]; (b) the use of communications facilities in commission of narcotics offenses, in violation of [21 U.S.C. § 843(b)]; (c) attempts and conspiracies to commit the aforementioned crimes, in violation of [21 U.S.C. §§ 846 and 963]; (d) money laundering and conspiracy to commit money laundering, in violation of [18 U.S.C. §§ 1956 and 1957]; ... (e) paying Medicare beneficiaries to sign for unnecessary medical services and utilizing Medicare prescription drug coverage to pay for prescription narcotic medications not provided to the beneficiary, in violation of [18 U.S.C. § 1347]; and [(f)] aiding and abetting

the aforementioned crimes, in violation of [18 U.S.C. § 2].

An Order authorizing the interception was signed by a United States District Judge for the Eastern District of Michigan on October 7, 2008.

### 2. November 6, 2008 Extension Application, Affidavit, and Order

On November 6, 2008, the AUSA submitted an Application for an extension of the October 7, 2008 Order. The Application was supported by an Affidavit from SA Dziedzic. SA Dziedzic's Affidavit incorporates by reference his Affidavits dated August 5, 2008, September 5, 2008, and October 7, 2008.

The AUSA sought:

authorization to intercept wire communications of GEORGE KEVIN WILLIAMS, a/k/a Kevin Williams, George (no middle name) Williams, Keith Smith and Rick Williams, YOLANDO VONALDO YOUNG, a/k/a "Yolanda"; ANTHONY RICHARDSON; BRANDON DAVID WILLIAMS; GREGORY LEE PALMER; QUICK RESPONSE MEDICAL PROFESSIONALS; LOUIS RAY BELL; ERNEST LARRY ADAMS; ELEANOR MANIQUIS; MILAGROS EBREO; EASTSIDE DISCOUNT PHARMACY; KATRINA LYONS; MICHAEL MCDONALD; JAMES MCKARGE; NEIL MARLEY CHAPPLE; MAHMOUD ABDULILAH FARDOUS; MUNIF NASIR (or NASSER) MAWRI; ALI MOHAMAD FARDOUS; MIKE LNU, LUKE JONES; MARLENE TROTTER and others as yet unknown ... concerning offenses ... involving (a) the distribution and possession with intent to distribute narcotic controlled substances, in violation of [21 U.S.C. § 841(a)(1)]; (b) the use of communications facilities in commission of narcotics offenses, in violation of [21 U.S.C. § 843(b)]; (c) attempts and conspiracies to commit the aforementioned crimes, in violation of [21 U.S.C. §§ 846 and 963]; (d) money laundering and conspiracy to commit money laundering, in violation of [18 U.S.C. §§ 1956 and 1957]; ... (e) paying Medicare beneficiaries to sign for unnecessary medical services and utilizing Medicare prescription drug coverage to pay for prescription narcotic medications not provided to the beneficiary, in violation of [18 U.S.C. § 1347]; and [(f)] aiding and abetting the aforementioned crimes, in violation of [18 U.S.C. § 2].

An Order authorizing the extension was signed by a United States District Judge for the Eastern District of Michigan on November 6, 2008.

### D. Procedural History

On December 11, 2009, Williams filed a "Motion to Suppress Evidence Obtained or Derived from Illegal Interception of Wire Communications." (Doc. # 126).

On January 29, 2010, 2010 WL 420008, Magistrate Judge Virginia M. Morgan submitted a Report and Recommendation ("R & R") recommending the Court DENY Defendant's motion. (Doc. # 161). According to the Magistrate Judge, SA Dziedzic's Affidavits satisfy the requirements of 18 U.S.C. § 2518(3)(c) (issuing judge must determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous").

Before the Court is Williams' "Objections to Magistrate Judge Morgan's Report and Recommendation to Deny Defendant's Motion to Suppress Evidence Obtained or Derived from Illegal Interception of Wire Communications." (Doc. # 166). Williams asks the Court to suppress evidence obtained or derived from the wiretaps.

In the alternative, Williams requests an evidentiary hearing to determine the extent of the information that SA Dziedzic omitted from his Affidavits in support of the wiretap Applications.

Defendant Neil Chapple joins in Williams' objections. (Doc. # 168).

## II. BRIEF OVERVIEW OF TITLE III OF THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968

Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 *et seq.*, after the Supreme Court's decisions in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (New York's statute that allowed a judge to issue an ex parte order for eavesdropping violates the Fourth and Fourteenth Amendments) and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (electronically recording words spoken into a telephone receiver in a public telephone booth constituted a search and seizure under the Fourth Amendment and does not comply with constitutional standards without prior judicial sanctions and attendant safeguards). *See Scott v. United States*, 436 U.S. 128, 130, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).

The purpose of Title III is to regulate and control warrants for wiretaps. *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir.1988). It creates limited authority for electronic surveillance in the investigation of specified crimes thought to lie within the province of organized criminal activity. *United States v. Kalustian*, 529 F.2d 585, 588 (9th Cir.1975) (citing S.Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2153). Under Title III, the Federal Government can conduct electronic surveillance, if it obtains judicial authority to do so and conducts the surveillance under carefully defined circumstances. *Id.* "Procedural steps provided in [Title III] require strict adherence." *Id.* (citing *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974)).

> Within our prescribed limits, ... the utmost scrutiny must be exercised to determine whether wiretap orders conform to Title III. [Title III] has been declared constitutional only because of its precise requirements and its provisions for close judicial scrutiny.

*Id.* at 589 (citations omitted); *see also Alfano*, 838 F.2d at 161 ("The basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III") (citations omitted).

## III. APPLICABLE LAW AND ANALYSIS

### A. Government's Duty to Show a Wiretap is Necessary

■ "Generally, the government must overcome the statutory presumption against granting a wiretap application by showing necessity." *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir.1985) (citing *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *United States v. Bailey*, 607 F.2d 237, 241 n. 11 (9th Cir.1979)); *see also* 18 U.S.C. § 2518(1)(c):

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter ... shall include ... a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]

The necessity requirement serves three purposes. First, it limits the use of wiretaps, which are highly intrusive. *United*

States v. Blackmon, 273 F.3d 1204, 1207 (9th Cir.2001) (citations omitted). Second, it ensures a wiretap "is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Alfano,* 838 F.2d at 163 (quoting *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974)). Third, "the necessity requirement protects against the impermissible use of a wiretap as the 'initial step in [a] criminal investigation.'" *United States v. Rice,* 478 F.3d 704, 710 (6th Cir.2007) (quoting *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974)); *see also Kalustian,* 529 F.2d at 589–90:

> Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications. These procedures were not to be routinely employed as the initial step in criminal investigation.

(Quoting *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974)).

■ The Government is not required to prove that it tried every other conceivable method and failed; that it exhausted all avenues of investigation; or, that all other means were absolutely impossible. *Alfano,* 838 F.2d at 163–64. "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Lambert,* 771 F.2d 83, 91 (6th Cir.1985) (citing *United States v. Alonso,* 740 F.2d 862, 868 (11th Cir.1984);

*United States v. Webster,* 734 F.2d 1048, 1055 (5th Cir.1984)).

■ A purely conclusory affidavit that does not contain information about the particular facts of the case is inadequate because it does not provide facts from which a detached judge or magistrate can determine whether alternative investigative procedures exist as a viable alternative. *See Kalustian,* 529 F.2d at 590; *see also* 18 U.S.C. § 2518(3)(c):

> the judge may enter an ex parte order ... authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting ... if the judge determines on the basis of the facts submitted by the applicant that[ ] normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

The application must be denied if the Government does not allege specific circumstances that render traditional investigative techniques ineffective. *Ippolito,* 774 F.2d at 1486 (citing *United States v. Abascal,* 564 F.2d 821, 825–26 (9th Cir.1977); *United States v. Kerrigan,* 514 F.2d 35, 38 (9th Cir.1975)); *see also United States v. Robinson,* 698 F.2d 448, 453 (D.C.Cir. 1983):

> we must be careful not to permit the government merely to characterize a case as a "drug conspiracy" ... that is therefore inherently difficult to investigate. The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.

(Emphasis in original) (citations omitted).

In determining whether SA Dziedzic's Affidavits satisfy the necessity requirement, the Court views the information "in a practical and common sense fashion."

*United States v. Landmesser,* 553 F.2d 17, 20 (6th Cir.1977) (citing S.Rep. No. 1097, 1968 U.S.Code Cong. & Ad.News, p. 2190); *see also Kalustian,* 529 F.2d at 589:

> [w]here [the underlying circumstances in the affidavit] are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense[sic], manner.

(Quoting *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)).

If the necessity requirement is not met, the Court must suppress any evidence obtained through SA Dziedzic's Affidavits. *See Rice,* 478 F.3d at 710.

### B. Confidential Sources

During this investigation, SA Dziedzic received information from confidential sources:

(1) The phone number and contact person for QRMP;

(2) The name of Dr. Milagros Ebreo's assistant (Dr. Ebreo is allegedly a physician who saw fake patients);

(3) The visits with Dr. Ebreo initially occurred in a hotel in Southfield;

(4) Between November 2007 and January 2008, the operation moved from the hotel to 20226 Stratford in Detroit;

(5) CS1 earned approximately $220.00 per visit;

(6) In 2007, CS3 purchased approximately 400 pills of 80mg OxyContin from Williams for $9,600.00; and

(7) In July 2007, CS3 attempted to purchase additional OxyContin pills from Williams, but he raised the price of each pill by approximately three dollars.

SA Dziedzic's Affidavits also addressed the traditional investigative techniques.

### C. Traditional Investigative Techniques Tried and Failed

SA Dziedzic said he tried three traditional investigative techniques that failed: (1) confidential sources; (2) physical surveillance; and (3) toll records.

#### 1. Confidential Sources

##### a. CS1

SA Dziedzic tried to use CS1 to obtain evidence that Dr. Ebreo was writing illegitimate prescriptions, but his attempt was unsuccessful.

On May 28, 2008, SA Dziedzic recorded three voice mail messages from Young, in which she attempted to schedule an appointment for CS1 with Dr. Ebreo.

On July 2, 2008, SA Dziedzic monitored a consensual telephone call between CS1 and Young, in which CS1 attempted to schedule an appointment with Dr. Ebreo. During the conversation, Young informed CS1 that the rest of the week was booked, she "didn't think" CS1 would return for more visits since Young heard that "feds ... like DEA" came to CS1's house, and Young no longer scheduled appointments. SA Dziedzic believes Young was lying when she said she no longer scheduled appointments, and she tried to avoid talking to CS1 because she thought CS1 was cooperating with law enforcement.

On July 8, 2008, SA Dziedzic monitored and recorded a conversation between CS1 and Young, in which Young said she had not yet received an appointment date for CS1.

On August 6, 2008, CS1 received a call from Young, in which Young asked CS1 whether CS1 was available for an immediate appointment. SA Dziedzic believes Young's contact with CS1 was out of des-

peration for fake patients to fulfill Williams' order for 12 fake patients on August 6, 2008. Based on a previous agreement between CS1 and controlling DEA agents, CS1 turned down the offer. In addition, SA Dziedzic believed that such short notice was inadequate to arrange for a covert enforcement operation. When CS1 asked Young for an appointment on another day, Young told CS1 she had an opening on August 6th, and could not give CS1 an appointment for another day.

Based on the July 2, 2008 and August 6, 2008 conversations, SA Dziedzic did not believe CS1 could continue his or her participation as a fake patient.

### b. CS3

When SA Dziedzic attempted to put CS3 in direct contact with Williams, CS3 told him that Williams stopped associating with CS3, after he learned CS3 was a target of a separate law enforcement investigation.

Further, CS3 told SA Dziedzic that Williams and his employees were secretive about the "medical business," and the employees' duties within the organization.

### 2. Physical Surveillance

#### a. 20226 Stratford

Between March 2008 and August 2008, SA Dziedzic conducted physical surveillance of 20226 Stratford, a house that was allegedly used as an examination office under Williams' direction. SA Dziedzic observed a significant amount of fake patients. According to SA Dziedzic, the fake patients either arrived in personal vehicles, or were shuttled in by co-Defendant Gregory Palmer.

#### b. George Williams

SA Dziedzic conducted physical surveillance on Williams between January 2008 and September 2008.

However, SA Dziedzic said he was unclear where Williams lived.

In addition, while Williams and his associates frequented a high-rise apartment building in downtown Detroit, SA Dziedzic did not know which apartment, if any, was used for organizational purposes.

#### c. SA Dziedzic's Conclusions

SA Dziedzic said: (1) physical surveillance did not establish the roles of the named conspirators, identify additional conspirators, identify the pharmacies involved, or provide admissible evidence; (2) it is difficult to conduct surveillance of major drug traffickers over an extended period of time without detection, especially in a quiet residential neighborhood; (3) wiretap interceptions would pinpoint the starting times for surveillance, the locations of surveillance, and the events to be watched, which would reduce the length of surveillance and the chance of detection; and (4) physical surveillance did not reveal what happens to the controlled substances once the prescriptions are obtained.

According to SA Dziedzic, even if successful, physical surveillance would not allow agents to gather all of the evidence necessary to prosecute sophisticated drug distribution organizations. Rather, it only allows agents to confirm meetings between conspirators, leaving them to speculate as to the purpose of the meetings observed.

Finally, SA Dziedzic said Williams or his associates could discover the physical surveillance and compromise the investigation.

### 3. Toll Records

SA Dziedzic said toll records provided circumstantial evidence that the target telephones were used to make or receive calls. However, the toll records did not provide the content of the calls, the identity of the individuals making and receiving calls, nor did they achieve all of the investigative goals.

### D. Traditional Techniques Which Reasonably Appeared Unlikely to Succeed if Tried or Were Too Dangerous to Try

SA Dziedzic said the following traditional investigative techniques reasonably appeared unlikely to succeed if tried or were too dangerous to try: (1) undercover agents; (2) Closed Circuit Pole Cameras; (3) trash searches; (4) consensual telephone calls; (5) a Grand Jury investigation; (6) search warrants; and (7) "flipping" individuals into informants.

#### 1. Undercover Agents

SA Dziedzic said it was impossible for the confidential sources to introduce an undercover agent, and he did not have any other avenues for the introduction of an undercover agent. According to SA Dziedzic, "[b]ased on intelligence derived from CS1, it appears that each new 'fake patient' is recruited and subsequently introduced to YOUNG by previously established 'fake patients.'"

Further, SA Dziedzic said an undercover agent could not have conducted a cold "walk-in" and attempted to obtain an appointment; doing so would have confirmed the suspicion that the "feds" were investigating. SA Dziedzic said that even if the "walk-in" was successful, the undercover agent would not have been privy to the full scope of all co-conspirator conversations and activities, and would not have been exposed to all subjects—including Williams or any other upper-level members of his organization.

#### 2. Closed Circuit Pole Cameras

SA Dziedzic said he considered using closed circuit television ("CCTV") surveillance, but decided against it for four reasons: (1) it is stationary and only captures individuals at precise locations; (2) the majority of the overt criminal activity occurred inside 20226 Stratford; (3) there was a risk that the CCTV could be discovered and compromise the investigation;

and (4) the installation of a CCTV in the vicinity of the high-rise apartment building would have unlikely captured footage of evidentiary value.

#### 3. Trash Searches

SA Dziedzic said "[t]hrough my experience of investigating high-level organized traffickers and that of other agents with whom I have conferred, I know that many drug traffickers go to great lengths to destroy possible incriminating evidence and frequently will not use their trash containers to dispose of valuable information."

According to SA Dziedzic, it is not uncommon for drug traffickers to put trash in commercial dumpsters to avoid examination by law enforcement.

Further, SA Dziedzic said that while a trash search may have identified documents pertaining to medical examinations, pharmacy wrappings, or documents pertaining to patient information, it would not have provided information as to who transported the prescriptions, which pharmacy filled the prescriptions, and where the narcotics were stashed.

Finally, SA Dziedzic said generally, multi-unit apartment buildings use a common trash dumpster, which would make it impossible to determine the trash that originated from Williams or his associates.

#### 4. Consensual Telephone Calls

SA Dziedzic said drug traffickers are extremely careful when engaging in criminal conversations, and will not engage in such conversations with unknown individuals. SA Dziedzic said if agents attempted an undercover telephone call, the members of the organization would have been suspicious about how a person unfamiliar to them obtained their telephone numbers. SA Dziedzic said such action could raise suspicion resulting in the dumping of the phone.

### 5. A Grand Jury Investigation

SA Dziedzic said testimony before a Grand Jury would not have succeeded in exposing the full nature and scope of the criminal activity, or the identities of all the participants because: (1) it would have alerted the participants to the investigation, causing them to become more cautious or flee to avoid further investigation or prosecution; (2) if the participants were subpoenaed to the Grand Jury, it is likely they would have invoked their Fifth Amendment rights and refused to testify; (3) granting immunity to the participants would have foreclosed prosecution; and (4) it is reasonable to expect that any physical evidence, such as narcotics, records, or drug proceeds would have been destroyed or hidden.

### 6. Search Warrants

SA Dziedzic said "[t]he use of search warrants and interviews is premature. At this juncture, these techniques would alert the INTERCEPTEES to the existence of the investigation and would prevent the DEA and the FBI from identifying the full scope of the conspiracy as well as other co-conspirators; additionally[,] it may lead to the targets of this investigation fleeing the jurisdiction."

### 7. "Flipping" Individuals into Informants

SA Dziedzic considered flipping individuals in the organization into informants, but he believed such an attempt was too risky. According to SA Dziedzic, if the individuals did not cooperate, the wiretap investigation would be compromised, and the agents would risk the chance of identifying the pharmacies and pharmacists involved.

## IV. DEFENDANTS' OBJECTIONS

### A. Necessity Requirement

According to Defendants, SA Dziedzic's Affidavits do not satisfy the necessity re-quirement; he did not submit "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" *See* 18 U.S.C. § 2518(1)(c). Defendants say SA Dziedzic omitted relevant information, and did not provide legitimate reasons as to why the normal investigative techniques were inadequate. According to Defendants, if SA Dziedzic complied with the requirements of 18 U.S.C. § 2518, he would have conceded that all information sought through wiretaps was either already in the agents' possession, or could have been obtained through search warrants.

### 1. Information from Health and Human Services

Defendants say the Government had access to the following information from HHS, or its contracting agents, before the AUSA filed the first wiretap Application:

(1) every procedure, health complaint, and prescription written by Dr. Ebreo and every other physician involved in the organization.

(2) the date of the prescriptions, the date the prescriptions were filled, the quantity of pills, and the pharmacy where the prescriptions were filled.

(3) each physician that a patient consulted, each clinic where the patient was treated, the amount billed, and the amount paid by the Government.

(4) every patient, prescription, pharmacy, and physician connected or associated with the alleged conspiracy.

According to Defendants, the Government did not need a wiretap to discover fake patients, fake prescriptions, or to determine the pharmacies where the prescriptions were filled.

## 2. Search Warrants

Defendants say SA Dziedzic's sworn statements in his Affidavit for search warrants proves: (1) search warrants would have revealed any additional information sought by the Government; and (2) SA Dziedzic's statement in his Affidavits in support of the wiretap Applications, that the use of search warrants was premature and would prevent law enforcement from identifying the full scope of the conspiracy as well as other co-conspirators, was incorrect. According to Defendants, instead of waiting until November 2008, SA Dziedzic could have obtained search warrants before the AUSA applied for a wiretap in August 2008.

## 3. Information Contained in SA Dziedzic's Affidavits in Support of the Wiretap Applications

Defendants say a wiretap investigation was not necessary because the agents: (1) had multiple confidential sources; (2) photographed fake patients; (3) knew where the relevant pharmacies were located; (4) knew where Williams, the physicians, and the employees lived; and (5) went to the business office in Southfield before applying for a wiretap.

Further, Defendants say SA Dziedzic's statement, that agents could not approach any of the co-conspirators, was incorrect; Dr. Ebreo was interviewed on November 25, 2008, and her conspicuous absence from the Indictment demonstrates that she is still cooperating with the Government.

Finally, Defendants say SA Dziedzic's Affidavits contain boilerplate language.

## 4. Analysis

The Court finds the Government met its low burden of proof. *See Lambert*, 771 F.2d at 91.

First, the information Defendants say was available from search warrants; and, HHS, or its contracting agents—before the AUSA applied for a wiretap—would not have achieved the goals of the wiretap investigation, which included:

(1) identifying the places of operation, the locations used to conceal prescriptions, the identities and roles of the participants, the sources of the narcotics, and the methods of delivery;

(2) determining how money flows to and from the organization; and

(3) determining what happens to the controlled substances once the prescriptions are obtained.

Second, in SA Dziedzic's Affidavit for search warrants, he used intercepted telephone communications from the wiretap investigation to establish the probable cause necessary for a search warrant.

Third, the attempt to obtain information from Williams through CS3 was not successful, and SA Dziedzic was not sure where Williams lived. Further, the Court is not required to deny a wiretap application because some investigative techniques were successful in uncovering some evidence of wrongdoing. *See United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002).

Fourth, SA Dziedzic's statement, that approaching the co-conspirators was "too risky," and could compromise the wiretap investigation, was not incorrect. According to Defendants, SA Dziedzic did not approach Dr. Ebreo for an interview until November 25, 2008—after the wiretap investigation concluded.

Finally, while SA Dziedzic did use generic language in his Affidavits, he explained particularly why every traditional investigative technique failed, reasonably appeared unlikely to succeed if tried, or was too dangerous to try (except the Grand Jury investigation).

## B. Charges in the Indictment

In a footnote, Williams objects to the Magistrate Judge's finding that he is charged in counts 9–17. Williams says he is only charged in counts I, II, III, V, and VII.

In an e-mail dated March 5, 2010, the Government made it clear that Williams is not charged in counts 9–17:

> The right to be indicted by a federal grand jury for a felony is an important constitutional right provided by the Fifth Amendment. Since the Indictment is possibly ambiguous as to whether the Grand Jury actually indicted George Williams on those counts, the safer practice is to proceed as if he is NOT indicted on these counts.

## V. REQUEST FOR EVIDENTIARY HEARING

Defendants' request for an evidentiary hearing is **DENIED.** According to Defendants, the Magistrate Judge heard "extensive oral arguments" on January 11, 2010, and she does not believe an evidentiary hearing is necessary.

In addition, the Court does not need to determine the extent of the information Defendants allege SA Dziedzic omitted from his Affidavits. The parties engaged in extensive discovery, and Defendants presented the Court with the information they believe SA Dziedzic omitted from his Affidavits.

Finally, SA Dziedzic's Affidavits dated August 5, 2008, October 7, 2008, and November 6, 2008 say:

> Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation. I have only set forth the facts I believe are essential to establish the necessary foundation for an order authorizing the interception of wire communications.

Because the Court affords the issuing judge "considerable discretion" in deciding whether other investigative techniques might be successfully employed, it declines Defendants' request for an evidentiary hearing. *See Landmesser,* 553 F.2d at 20 (citing *United States v. Smith,* 519 F.2d 516, 518 (9th Cir.1975); *United States v. Daly,* 535 F.2d 434, 438 (8th Cir.1976)). If the issuing judge needed additional information to determine whether SA Dziedzic's Affidavits satisfy the necessity requirement, he could have asked SA Dziedzic what additional facts he knew about the investigation.

## VI. CONCLUSION

The Court **ADOPTS** the Magistrate Judge's R & R; Defendant's motion is **DENIED.**

**IT IS ORDERED.**

### REPORT AND RECOMMENDATION

VIRGINIA M. MORGAN, United States Magistrate Judge.

### I. Introduction

This matter comes before the court on defendant George Williams' Motion to Suppress Evidence Obtained or Derived From Illegal Interception (D/E # 126).[2] The government filed a response in opposition to the motion (D/E # 137) and this court heard oral arguments with respect to the motion on January 11, 2010. For the reasons discussed below, the court recommends that defendant George Williams' motion be **DENIED** and that the evidence

---

2. Co-defendants Chapple (D/E # 127), Palmer (D/E # 128), Nancy Williams (D/E # 129), Brandon Williams (D/E # 130), and Adams (D/E # 132) all joined in George Williams' motion to suppress.

obtained or derived from the wiretaps in this case not be suppressed.

## II. Background

### A. Indictment

In this case, defendant George Williams and ten co-defendants are charged together in an Indictment (D/E # 4). In the "General Allegations" section of the indictment, the government alleges that the named defendants and others engaged in a scheme and pattern of illegal conduct involving prescription drug controlled substances and fraudulent health care billings. (Indictment, p. 1) The Indictment alleges that George Williams organized and operated a purported health care business under the name Quick Response Medical Professionals, P.C. ("QRMP"). (Indictment, pp. 1–2) Brandon Williams and Nancy Williams assisted in the creation and operation of QRMP. (Indictment, p. 3) Brandon Williams and Nancy Williams are also alleged to have caused fraudulent Medicare billings. (Indictment, p. 3)

According to the Indictment, George Williams recruited fake patients to see doctors employed by QRMP, with QRMP employee Yolanda Young scheduling the visits and instructing the patients to ask for particular controlled substance prescriptions with a high street value. (Indictment, p. 2) Other employees of QRMP included Gregory Palmer and Darryl Williams, who transported most of the patients, and Anthony Richardson, who worked as a security guard protecting the cash and keeping order. (Indictment, p. 2)

The patients were paid up to $220 for their time and use of their Medicare card, but they did not retain the prescriptions. (Indictment, p. 2) The prescriptions were retained by George Williams, who had them filled at various cooperating pharmacies. (Indictment, p. 2) The controlled substances were then picked up by George Williams, Webb Smith, and/or Ernest Lar-

ry Adams. (Indictment, p. 2) Employees such as Smith or Adams were then directed to deliver the controlled substances to distributers in exchange for money. (Indictment, p. 2) One of the alleged distributers was Katrina Lyons. (Indictment, pp. 2–3)

George Williams is charged in Count One ("21 U.S.C. §§ 846, 841(a)(1)—Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances"); Count Two ("18 U.S.C. § 1347—Health Care Fraud"); Count Three ("42 U.S.C. § 1320a–7b—Unlawful Payments"); Count Five ("21 U.S.C. § 841(a) (1)—Possession with Intent to Distribute Controlled Substances–Cough Syrup with Codeine"); Count Seven ("21 U.S.C. § 841(a)(1)—Possession with Intent to Distribute Controlled Substances—Oxycodone"); Counts Nine–Seventeen ("21 U.S.C. § 841(a)(1), 18 U.S.C. § 2—Possession with Intent to Distribute a Controlled Substance, aiding and abetting"); and Count Eighteen ("Forfeiture Allegations (18 U.S.C. 981(a)(1)(C), and 28 U.S.C. 2461(c); 21 U.S.C. § 853)")

### B. Motion to Suppress

On December 11, 2009, George Williams filed the Motion to Suppress Evidence Obtained or Derived From Illegal Interception pending before the court (D/E # 126). In that motion, George Williams asserts that, prior to filing the Indictment, the United States Attorney intercepted numerous wire telecommunications among the alleged co-conspirators in this case, including communications involving George Williams as a participant in or subject of the communications. George Williams argues that the electronic surveillance and interception were unlawful and suppression is required in this case. According to George Williams, the Title III Applications and the Affidavits to the Applications failed to show necessity, or that other in-

vestigative procedures had been tried and failed, had been exhausted, and/or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous. George Williams also argues that the execution of search warrants would have revealed all other information sought by the government and that additional discovery further belies Special Agent Dziedzic's claims of "necessity" for the wire tap.[3]

On January 4, 2010, the government filed a response to George Williams' motion to suppress (D/E # 137). In that response, the government argues the terms "need" and necessity" in the defendant's motion are misnomers, since neither term appears in the relevant statute and the relevant statute only requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." The government also argues that the affidavits of Special Agent Dziedzic contains "information about particular facts of the case at hand" which demonstrates that serious consideration had been given to the use of non-wiretap techniques; that they were used beforehand with limited success; and that the continued use of these non-wiretap techniques or the use of other non-wiretap techniques that reasonably suggested themselves would in all likelihood be inadequate in achieving the goals of the investigation. According to the government, the affidavits were therefore sufficient and the evidence should not be suppressed.

### C. Applicable Legal Standards

Title 18 U.S.C. § 2518(1)(c) provides that each application for a wiretap submitted to a District Judge shall include: "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Title III surveillance may be authorized only if (1) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," and (2) an application includes a "a full and complete statement" to this effect. 18 U.S.C. § 2518(3)(c), (1)(c).

■ One purpose of the requirement is "to ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *United States v. Alfano,* 838 F.2d 158, 163 (6th Cir.1988), cert. denied, 488 U.S. 821, 109 S.Ct. 64, 65, 102 L.Ed.2d 42 (1988) (quoting *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974)). Stated another way, the purpose of the necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Landmesser,* 553 F.2d 17, 20 (6th Cir.1977) (quoting *United States v. Pacheco,* 489 F.2d 554, 565 (5th Cir.1974)).

■ Nevertheless, "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *United States v. Giacalone,* 853 F.2d 470, 480 (6th Cir. 1988) (quoting *Alfano,* 838 F.2d at 163). "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying

---

**3.** As noted above, co-defendants Chapple (D/E # 127), Palmer (D/E # 128), Nancy Williams (D/E # 129), Brandon Williams (D/E # 130), and Adams (D/E # 132) all joined in George Williams' motion to suppress.

for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Alfano,* 838 F.2d at 163–64 (quotation omitted). If less intrusive techniques do not suffice to expose the entire criminal conspiracy, then electronic surveillance is warranted. *See United States v. Maxwell,* 25 F.3d 1389, 1394 (8th Cir.1994); *U.S. v. Cooney,* 26 Fed. Appx. 513, 522 (6th Cir.2002). Moreover, "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *Cooney,* 26 Fed.Appx. at 522 (quoting *United States v. Steinberg,* 525 F.2d 1126, 1130 (2d Cir.1975)).

### D. Summary of Wiretap Applications

During the investigation, the government filed several applications to intercept wire and electronic communications. On August 5, 2008, the government filed an application to intercept communications as to Target Telephone 1, a telephone used by defendant Young. On September 5, 2008, the government filed an application to continue its interception of communications relating to Target Telephone 1. On October 7, 2008, the government filed an application to intercept communications as to Target Telephone 2 and Target Telephone 3, telephones used by defendant George Williams. On November 6, 2008, the government filed an application to continue its interception of communications relating to Target Telephones 2 and 3. The Honorable Avern Cohn granted each of those applications.

Special Agent Christopher Dziedzic of the Drug Enforcement Administration ("DEA") filed affidavits in support of the applications. As noted by defendant, three of Special Agent Dziedzic's affidavits contains the following statement:

> Since this affidavit is being submitted for the limited purpose of securing au-

thorization for the interception of wire communications, I have not included each and every fact know to me concerning this investigation. I have only set forth the facts I believe are essential to establish the necessary foundation for an order authorizing the interception of wire communications.

[August 5, 2008 affidavit, ¶ 2; September 5, 2008 affidavit, ¶ 22–34, pp. 15–22; October 7, 2008 Affidavit, ¶ 2; November 6, 2008 Affidavit, ¶ 2]

Each affidavit also contains include a lengthy portion dedicated to meeting the government's obligation of showing that alternative means of investigation had been given serious consideration. (August 5, 2008 Affidavit, ¶¶ 43–56, pp. 20–27; September 5, 2008 Affidavit, ¶¶ 22–34, pp. 15–22; October 7, 2008 Affidavit, ¶¶ 33–42, pp. 8–12; November 6, 2008 Affidavit, ¶¶ 18–32)

In his first affidavit in support of the application to intercept wire and electronic communications as to Target Telephone 1, Special Agent Dziedzic stated that

> I believe the interception of wire communications of the **INTERCEPTEES** and others yet unknown on **Target Telephone 1** is the only available investigative technique which has a reasonable likelihood of revealing and securing admissible evidence needed to establish the full scope and nature of the offenses being investigated, including determining the identity of all the members of the organization, to include pharmacies and other medical doctors. The make up of the organization, locations used to conduct illegitimate medical examinations, locations used to conceal prescriptions, and scheduled controlled substances.

(August 5, 2008 Affidavit, ¶ 44) (emphasis in original) According to Special Agent Dziedzic, a wiretap was necessary because

"normal investigative techniques have been used and have not succeeded in achieving the goals of the investigation, or have been tried and failed or had only limited success, or reasonably appear to be unlikely to succeed if tried, or they are too dangerous to employ." (August 5, 2008 Affidavit, ¶ 43)

With respect to the normal investigative techniques used, Special Agent Dziedzic discussed the use of confidential sources. According to Special Agent Dziedzic, in March of 2008, he was told by a confidential source, CS1, of a location where a Dr. Ebreo was had been and was currently seeing patients on behalf of QRMP. (August 5, 2008 Affidavit, ¶ 18) CS1's initial reports were confirmed by the Michigan Automated Prescription System (MAPS), which showed that CS1 was seen on multiple occasions by Dr. Ebreo and CS1 has been cooperating with DEA since March of 2008. (August 5, 2008 Affidavit, ¶ 23) According to CS1, visits were scheduled by Yolando Young using Target Telephone 1 and CS1 had been scheduled by Young and seen by Dr. Ebreo on multiple occasions. (August 5, 2008 Affidavit, ¶ 18) On July 2, 2008, Special Agent Dziedzic monitored a consensual telephone call placed by CS1 to Target Telephone and the subsequent conversation between CS1 and Young. (August 5, 2008 Affidavit, ¶ 30) CS1 tried to scheduled a visit, but Young said the rest of the week was booked. (August 5, 2008 Affidavit, ¶ 30) Young also said she did not think that CS1 was coming back since Young had heard that "feds … like DEA" came to CS1's residence. (August 5, 2008 Affidavit, ¶ 30) CS1 denied this and again asked for an appointment, but Young said she would have to check and get back with CS1 because Young no longer schedules appointments. (August 5, 2008 Affidavit, ¶ 30) Special Agent Dziedzic believes Young said this because she suspects CS1 is cooperating with law enforcement and did not want to talk to her. (August 5,

2008 Affidavit, ¶ 30) CS1 called again on July 8, 2008 and spoke with Young. (August 5, 2008 Affidavit, ¶ 31) Special Agent Dziedzic again recorded the conversation, in which CS1 further inquired about an appointment and Young stated Dr. Ebreo's assistant had not given her one yet. (August 5, 2008 Affidavit, ¶ 31) Young said she would call CS1 with the information when the assistant gave it to her. (August 5, 2008 Affidavit, ¶ 31)

Young had not called back as of July 16, 2008 and Special Agent Dziedzic believes it was because of her suspicions about CS1. (August 5, 2008 Affidavit, ¶ 32) Special Agent Dziedzic also believed that, given the conversations between CS1 and Young, his attempt to insert a confidential source into the QRMP organization for the purpose of obtaining further evidence of illegitimate prescription writing by Dr. Ebreo was unsuccessful and that any use of confidential sources would be unsuccessful. (August 5, 2008 Affidavit, ¶ 46)

Additionally, Special Agent Dziedzic stated in his affidavit that use of an undercover agent would also be unsuccessful because Special Agent Dziedzic did not have a way to introduce an undercover agent into the organization, as each new fake patient is recruited and introduced to Young be established fake patients. (August 5, 2008 Affidavit, ¶ 46) Moreover, according to Special Agent Dziedzic, an undercover agent attempting to set up an appointment on his own would only confirm the suspicions of the targets that they were being investigated and that, even if an undercover agent successfully became a patient, he would not be privy to all co-conspirator conversations and would not be able to expose all subjects of the investigation. (August 5, 2008 Affidavit, ¶ 46)

Special Agent Dziedzic's affidavit also discussed the use of physical surveillance. According to Special Agent Dziedzic,

physical surveillance is used to confirm meetings and other suspected activities between alleged participants, but the surveillance observations by themselves are generally insufficient to prove the purpose of the meetings and other activities. (August 5, 2008 Affidavit, ¶ 47) Special Agent Dziedzic further stated in his affidavit that, based on his experience, it is extremely difficult to avoid detection and conduct surveillance of major drug traffickers over an extended period of time, especially in a quiet residential neighborhood and where law enforcement must keep a blanket surveillance on hand since they do not know the times of meetings. (August 5, 2008 Affidavit, ¶ 48) Furthermore, according to the affidavit, while physical surveillance alone is unlikely to establish the roles of the names conspirators, to identify additional conspirators or otherwise provide admissible evidence in regard to the investigation (August 5, 2008 Affidavit, ¶ 49), physical surveillance combined with intercepted calls could constitute valuable proof of the criminal activities inside the residence (August 5, 2008 Affidavit, ¶ 48).

The third investigative techniques used discussed by Special Agent Dziedzic was the evaluation of toll records for Target Telephone 1. According to Special Agent Dziedzic, those records are insufficient because they provide only circumstantial evidence that the telephone to be monitored was used, they do not identify who made the call or who received it, and they do not provide the content of the calls. (August 5, 2008 Affidavit, ¶ 53)

With respect to the normal investigative techniques that reasonably appeared to be unlikely to succeed if tried or they are too dangerous to employ, Special Agent Dziedzic first discussed the use of Closed Circuit Pole Cameras ("CCTV"). According to Special Agent Dziedzic, CCTV are not very useful because they are stationary and only capture the presence of individuals at very precise locations. (August 5, 2008 Affidavit, ¶ 50) Furthermore, Special Agent Dziedzic also noted that most of the overt criminal activities in this case appear to take place inside buildings. (August 5, 2008 Affidavit, ¶ 50)

Special Agent Dziedzic also rejected the use of trash searches because, through his experience, he knows that drug traffickers go to great lengths to destroy possibly incriminating evidence and such searches are unlikely to succeed. (August 5, 2008 Affidavit, ¶ 51)

Another investigative technique expressly rejected by Special Agent Dziedzic was the use of consensual calls and recording those calls. As stated in the affidavit, "[t]ypically, narcotics traffickers are extremely careful when engaging in criminal conversations and will not tend to engage in such conversations with unknown individuals." (August 5, 2008 Affidavit, ¶ 52) Also, in Special Agent Dziedzic's view, calls from unknown individuals could cause suspicion. (August 5, 2008 Affidavit, ¶ 52)

Special Agent Dziedzic's affidavit also discussed the use of a Grand Jury investigation or interviewing the interceptees or their associates directly. According to Special Agent Dziedzic, either of those techniques would not be successful in exposing the full nature and scope of the criminal activity or the identity of all participants. (August 5, 2008 Affidavit, ¶ 54) Additionally, Special Agent Dziedzic believed that any attempt to start a Grand Jury investigation or interview a suspect would also alert suspects to the investigations, causing them to become more cautious or flee to avoid further investigation. (August 5, 2008 Affidavit, ¶ 54) Lastly, Special Agent Dziedzic noted that, if they were subpoenaed, the targets would refuse to testify and a grant of immunity would

foreclose prosecution. (August 5, 2008 Affidavit, ¶ 54)

The final investigative technique expressly rejected by Special Agent Dziedzic was the use of search warrants. According to Special Agent Dziedzic, the use of search warrants was premature and it would only alert suspects to the investigation and prevent law enforcement from identifying the full scope of the conspiracy as well as other co-conspirators. (August 5, 2008 Affidavit, ¶ 55)

In his second affidavit, which was made in support of an application seeking authorization for the continued interception of wire and electronic communications as to Target Telephone 1, Special Agent Dziedzic again opined that the interception of wire communications of the interceptees and others yet unknown on Target Telephone 1 is the only available investigative technique which has a reasonable likelihood of revealing and securing admissible evidence needed to establish the full scope and nature of the offenses being investigated. (September 5, 2008 Affidavit, ¶ 23) In support of that opinion, Special Agent Dziedzic again discussed what normal investigative techniques had been used and been found insufficient, as well as those normal investigative techniques that had not been utilized because they reasonably appeared to be unlikely to succeed if tried or they are too dangerous to employ. (September 5, 2008 Affidavit, ¶¶ 24–34) That discussion of investigative techniques mirrors, with one exception, the discussion of investigation techniques in Special Agent Dziedzic's earlier affidavit.

The one major difference in the two affidavits involved events concerning CS1 that occurred after the first application was made. According to the second affidavit, Young called CS1 on August 6, 2008 around 12:32 p.m. in an attempt to have CS1 come in for an appointment immediately. (September 5, 2008 Affidavit, ¶ 25)

Pursuant to a previous agreement with DEA, CS1 turned down that offer. (September 5, 2008 Affidavit, ¶ 25) CS1 did ask to come in another day, but Young said she just happened to have an opening that day and could not give CS1 an appointment for another day. (September 5, 2008 Affidavit, ¶ 25)

According to Special Agent Dziedzic, that phone call did not change his opinion regarding the viability of using CS1 as a confidential source. (September 5, 2008 Affidavit, ¶ 25) Special Agent Dziedzic described how he believed, on the basis of an intercepted phone call, that Young only called CS1 out of desperation to fulfill George Williams' orders regarding how many patients he expected that particular day. (September 5, 2008 Affidavit, ¶ 25) Special Agent Dziedzic also affirmed that such short notice was inadequate to arrange for a covert operation. (September 5, 2008 Affidavit, ¶ 25)

In his third affidavit, which was made in support of an application seeking authorization for the interception of wire and electronic communications as to Target Telephones 2 and 3, Special Agent Dziedzic opined that the interception of wire communications of the interceptees and others yet unknown on Target Telephone 2 and Target Telephone 3 is the only available investigative technique which has a reasonable likelihood of revealing and securing admissible evidence needed to establish the full scope and nature of the offenses being investigated. (October 7, 2008 Affidavit, ¶ 56) In support of that opinion, Special Agent Dziedzic again discussed what normal investigative techniques had been used, and been found insufficient, as well as those normal investigative techniques that had not been utilized because they reasonably appeared to be unlikely to succeed if tried or they are too dangerous to employ. (October 7, 2008

Affidavit, ¶¶ 57–68) That discussion of investigative techniques mirrors, with one exception, the discussion of investigation techniques in Special Agent Dziedzic's second affidavit.

The one major difference in the third affidavit is the discussion of another confidential source, CS3. According to the affidavit, sometime in April 2007, CS3 heard George Williams have a phone conversation pertaining to OxyContin. (October 7, 2008 Affidavit, ¶ 18) CS3 then asked if George Williams had the ability to obtain such pills because CS3 could redistribute them for profit. (October 7, 2008 Affidavit, ¶ 18) George Williams informed CS3 that he may be able to arrange something. (October 7, 2008 Affidavit, ¶ 18) In late May or June 2007, CS3 purchased approximately two-hundred pills of 80mg OxyContin directly from George Williams for $4,800.00 (October 7, 2008 Affidavit, ¶ 18) Approximately one month later, "CS3 arranged for a second transaction of 200 pills of 80mg directly from GEORGE WILLIAMS [sic] for $4,800.00." (October 7, 2008 Affidavit, ¶ 19) In July of 2007, CS3 had a phone conversation with George Williams over Target Telephone 1 in an attempt to arrange a third transaction, but the price was too high. (October 7, 2008 Affidavit, ¶ 19)

According to Special Agent Dziedzic, CS3 has been cooperating with the DEA since approximately May of 2008. (October 7, 2008 Affidavit, ¶ 17) Special Agent Dziedzic held a discussion with CS3 in an attempt to potentially insert CS3 directly in contact with George Williams, but CS3 related that George Williams had ceased any further contacts with CS3 upon learning the CS3 became a target of a separate law enforcement investigation. Additionally, CS3 told Special Agent Dziedzic that George Williams and his employees are very secretive about their business. (October 7, 2008 Affidavit, ¶ 58)

In his fourth affidavit, which was made in support of an application seeking the continued authorization for the interception of wire and electronic communications as to Target Telephones 2 and 3, Special Agent Dziedzic opined that the interception of wire communications of the interceptees and others yet unknown on Target Telephone 2 and Target Telephone 3 is the only available investigative technique which has a reasonable likelihood of revealing and securing admissible evidence needed to establish the full scope and nature of the offenses being investigated. (November 6, 2008 Affidavit, ¶ 19) In support of that opinion, Special Agent Dziedzic again discussed what normal investigative techniques had been used and been found insufficient, as well as those normal investigative techniques that had not been utilized because they reasonably appeared to be unlikely to succeed if tried or they are too dangerous to employ. (November 6, 2008 Affidavit, ¶¶ 18–32) That discussion of investigative techniques mirrors, with one exception, the discussion of investigation techniques in Special Agent Dziedzic's third affidavit.

The one major difference in the fourth affidavit is a discussion relating to the possibility of approaching with one the suspects in light of recent traffic stops and seizures organized by the DEA. According to Special Agent Dziedzic:

Based on recent enforcement activities that resulted in seizures of controlled substances from GEORGE WILLIAMS [sic] and his associates, a consideration was made to flip an individual, like ADAMS [sic], into an informant and attempt to gain his cooperation. [Special Agent Dziedzic] believes that this attempt would be too risky at this stage of the investigation. If ADAMS [sic] decided not to cooperate and then reveal his contact and conversation with law enforcement, it would support GEORGE

WILLIAMS'S [sic] suspicion of an ongoing investigation rather than his current belief of coincidence and "weird" situations. Similarly, the same idea of gaining cooperation from BELL, GEORGE WILLIAMS or CHAPPLE [sic] could lead to the compromise of the ongoing T–III investigation and risk the chances of identifying pharmacies and pharmacists involved.

[November 6, 2008 Affidavit, ¶ 22]

### III. Discussion

■ In this case, as described above, each of Special Agent Dziedzic's affidavits state that the government used some normal investigative techniques; such as using confidential informants, doing physical surveillance and evaluating toll records, while rejecting the use of others; such as interviewing some of the suspects directly or using undercover agents, Closed Circuit Pole Cameras, trash searches, consensual telephone calls, Grand Jury investigations or search warrants. Special Agent Dziedzic's affidavits also state that, in light of the results of the normal investigative techniques used and the rejection of other techniques, interception of wire communications were necessary to reveal and secure the admissible evidence needed to establish the full scope and nature of the offenses being investigated, including determining the identity of all the members of the organization, the make up of the organization, locations used to conduct illegitimate medical examinations, locations used to conceal prescriptions, and locations used to conceal scheduled controlled substances.

Despite the detailed and thorough explanations in Special Agent Dziedzic's affidavits, defendant argues that the affidavits failed to demonstrate necessity, or that other investigative procedures had been tried and failed, had been exhausted, or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous. In particular, defendant notes that, through the Department of Health and Human Services or its contracting agents, the government had access to every patient, every prescription, every pharmacy and every physician connected or associated with QRMP. Defendant also notes that Special Agent Dziedzic admits in his affidavits that, through the normal investigative techniques used, the government had located cooperating individuals, watched and photographed "patients" entering and leaving each of the QRMP locations, and knew of the relevant pharmacies and their locations, the homes and residences of George Williams and some of the physicians and employees of the QRMP prior to seeking a wire tap. Defendant further argues that an execution of search warrants would have revealed all of the other information sought by the government.[4]

This court finds that Special Agent Dziedzic's affidavits have met the requirements of 18 U.S.C. § 2518(3)(c). As described above, the purpose of the requirements are "not to foreclose electronic surveillance until every other imaginable

---

4. Defendant also argues that the evidence should be suppressed because Special Agent Dziedzic stated in his affidavits that he is withholding relevant information concerning the investigation and tailoring his statements in an attempt to secure wire tap authorization. However, Special Agent Dziedzic never said that he was withholding relevant information and, instead, merely stated that he did not include each and every fact know to him concerning the investigation and that he only set forth the essential facts. (August 5, 2008 affidavit, ¶ 2; September 5, 2008 affidavit, ¶ 22–34, pp. 15–22; October 7, 2008 Affidavit, ¶ 2; November 6, 2008 Affidavit, ¶ 2) Furthermore, defendant fails to identify any relevant information that was omitted from the affidavits.

method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *Landmesser,* 553 F.2d at 20 (quoting *Pacheco,* 489 F.2d at 565). Here, the affidavits described the use and effect of the normal investigative techniques used. The affidavits, as well as defendant's motion, also identify the significant amount of information that the government gained through those normal investigative techniques prior to filing the applications for wiretaps. However, that information did not encompass the full scope and nature of the conspiracy.

Additionally, the affidavits also described why the normal investigative techniques not used reasonably appeared to be unlikely to succeed if tried or to be too dangerous. For example, Special Agent Dziedzic stated that, while past use of confidential sources like CS1 and CS3 had brought about relevant information, using those sources further was impossible given the past history between the confidential sources and the targets of the investigation. Special Agent Dziedzic also described how the use of an undercover agent would also be unsuccessful because he did not have a way to introduce an undercover agent into the organization without alerting suspicions, and how Closed Circuit Pole Cameras, trash searches or consensual telephone calls would be of limited utility. Special Agent Dziedzic's affidavit further described how a Grand Jury investigation, interview of the interceptees or their associates directly, and the use of search warrants would only alert suspects to the investigation and prevent law enforcement from identifying the full scope of the conspiracy as well as other co-conspirators. Defendant fails to show how any of the rejected techniques would have been reasonably likely to succeed and, instead, merely states that Special Agent Dziedzic's conclusions were un-

supported. However, as described above, the affidavits were very detailed as to why certain techniques were rejected.

Additionally, as noted by the government in its response, many of the reasons Special Agent Dziedzic used for rejecting certain investigative techniques have been previously accepted by courts. *See, e.g., U.S. v. Alfonso,* 552 F.2d 605, 611 (5th Cir.1977) (noting that the affiant agent had stated that execution of a search warrant was unlikely to implicate the major controllers of the gambling operation and that, due to the clandestine nature of the operation, only wiretapping offered a reasonable likelihood of securing evidence necessary to prove the gambling violations and to apprehend the top figures of the organization); *United States v. Lambert,* 771 F.2d 83, 91 (6th Cir.1985) ("The affidavits in support of the wiretap application explained in great detail that other investigative measures could not reasonably be used because of Lambert's extreme (and correct) suspicion that his activities were being monitored and the fact that alternative investigative procedures, such as directly questioning Lambert and his associates, would likely alert the subjects to the presence and scope of the investigation."); *United States v. Rodriguez,* 734 F.Supp. 116, 122 (S.D.N.Y.1990) ("Using the grand jury would not be helpful because the witnesses who could provide information were part of the conspiracy, and would likely not testify voluntarily. Moreover, it would alert the subjects that they were being investigated. Using grand jury subpoenas would not be helpful because low-level confederates would not be able to provide information about the manner in which their higher-level confederates were running the organization.").

As discussed above, "the government is not required to prove that every other conceivable method has been tried and

failed or that all avenues of investigation have been exhausted," *Giacalone,* 853 F.2d at 480 (quoting *Alfano,* 838 F.2d at 163, and "[a]ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate)." *Alfano,* 838 F.2d at 163–64 (quotation omitted). Here, given the that the affidavits detailed the normal investigative techniques used, information gained from those techniques as well as the information still needed, and the consideration and rejection of other techniques, Special Agent Dziedzic's affidavits have met the requirements of 18 U.S.C. § 2518(3)(c) and the evidence obtained or derived from the interception of wire communications should be suppressed.

### IV. Conclusion

For the reasons discussed above, this court recommends that defendant George Williams' motion be **DENIED** and that the evidence obtained or derived from the wiretaps in this case not be suppressed.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.1991);

*Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

Date: January 29, 2010.