UNITED STATES of America,
Plaintiff-Appellee,

v.

James Purdy LAMBERT (84–5660);
Philip M. Block (84–5661),
Defendants-Appellants.

Nos. 84–5660, 84–5661.

United States Court of Appeals,
Sixth Circuit.

Argued June 5, 1985.

Decided Aug. 16, 1985.

James A. Shuffett (argued), Lexington, Ky., Michael D. Baker, Frank E. Haddad, Jr., Louisville, Ky., for defendant-appellant in No. 84–5660.

Louis DeFalaise, U.S. Atty., Lexington, Ky., Robert Trevey, Jane Graham (argued), for plaintiff-appellee.

Albert T. Quick, David Friedman, American Civil Liberties Union of Ky., Louisville, Ky., for amicus curiae in No. 84–5660.

Donald D. Waggener (argued), Lexington, Ky., (Court appointed), for defendant-appellant in No. 84–5661.

Before KENNEDY and WELLFORD, Circuit Judges, and WEICK, Senior Circuit Judge.

WEICK, Senior Circuit Judge.

Defendants-Appellants James Lambert and Phillip Block entered conditional pleas of guilty in the District Court, pursuant to Federal Rules of Criminal Procedure, Rule 11(a)(2), to single counts of their respective indictments charging conspiracy and distribution of controlled substances in violation of 21 U.S.C. § 846. In their conditional pleas, the defendants reserved the right to appeal from the District Court's denial of their pretrial motions to suppress evidence obtained by the government through electronic wiretapping, the execution of a search warrant and the actions of an FBI informant. Each defendant was sentenced to five years imprisonment. Defendant Block, in his appeal, also challenged the court's ruling that he lacked standing to object to the admission of this evidence. For the reasons hereinafter stated, we conclude that the District Court acted properly in admitting the challenged evidence and correctly decided the other issues raised. We affirm the convictions.

## I.

Defendants have objected to the introduction of evidence seized by the government's informant, Diana Hall, as well as the evidence obtained from the FBI's use of electronic surveillance of defendant Lambert's home and its later physical search of his home and vacation cabin. Our discussion of the facts of this case will, therefore, be limited to these particular matters.

In December 1982, defendant Lambert hired Diana Hall to be his housekeeper. Hall claims that Lambert and his friends openly used illegal drugs in the house. Beginning in May 1982, Hall approached the Federal Bureau of Investigation (FBI) and provided information about Lambert's drug activities. Hall concedes that the FBI paid her some expense money but she insists that her decision to go to the FBI was not motivated by money. Rather, she claims that she acted because of her concerns about the negative effects of drug use, particularly on young people, and her worry about Lambert's health. Over the course of the following year, Hall contacted the FBI approximately 25 times concerning Lambert's activities.

During several of her meetings with the FBI, Hall brought items which she had taken from the Lambert home. These items included test tubes, pills and other drug paraphernalia, as well as check stubs and phone bills which Hall thought might be related to Lambert's drug transactions. She insisted that these items had been discarded or abandoned by Lambert and that she had picked them up while performing her housekeeping duties.

Hall emphasized that the FBI never asked her to retrieve any items from Lambert's house or even suggested that this would be helpful to them. Agent Bill

Welsh confirmed this during his testimony before the court. In fact, Hall and Welsh both testified that, after she had expressed a desire to search Lambert's closed safe and his garage, the FBI agents specifically told her *not* to do so.

In November 1982, defendant Block visited Lambert at his home and stayed for a few days in a basement bedroom. During that time, several other persons visited the home and a meeting took place in the basement. Hall, who was working upstairs, smelled chemical odors coming from the basement. She believed that the odors were caused by cocaine being cut or purified. The next day, as she was cleaning the basement, Hall went into a closet and discovered a small football-sized object. Next to it was a thermos. The thermos contained a white powder. Suspecting cocaine, Hall brought a sample from the thermos to the FBI. She emphasized that the FBI had not asked her to search for drugs or to bring this item to its office. The FBI analyzed the powder in its crime lab and determined that it was indeed cocaine.

Beginning on January 5, 1983, the U.S. Attorney made several applications to U.S. District Judge Moynahan for permission to wiretap Lambert's house. Each application contained extensive information detailing Lambert's drug related activities. The applications also stated that normal investigative procedures could not be used and that, as a result, the wiretaps were necessary. Each application was for a 30 days period. The applications were approved by Assistant Attorney General of the United States D. Lowell Jensen. Judge Moynahan read the applications and then issued orders authorizing the wiretaps. On January 7, 1983, the U.S. Attorney's Office requested the court to amend its January 5th order so as to permit Diana Hall (identified as "a confidential source" or "CS-1") to install and then remove the listening devices. This amended request was signed by an assistant U.S. Attorney but not by Assistant Attorney General Jensen. After the court approved the request, Diana Hall let several FBI agents into Lambert's house so that they could install the wiretaps. Wire-

taps were placed in the basement, living room and bedroom.

The initial wiretap application was, as noted above, for a 30 day period. At the conclusion of the 30 days, the U.S. Attorney's Office applied for a 30 day extension. In the application for extension, the U.S. Attorney presented the court with more information concerning Lambert's suspected involvement with illegal drugs. The U.S. Attorney submitted an affidavit from FBI Agent Welsh which explained the Bureau's reasons for wishing to continue the wiretaps. According to Welsh, the information gathered from the initial wiretaps indicated that Lambert was probably discussing drug activities but the FBI was not completely sure because Lambert and his friends frequently used code words and double talk or simply whispered in low voices when allegedly conversing about drugs. The FBI believed, Welsh stated, that a continuation of the wiretaps would permit it to make a more definite assessment of whether drug-related activities were, in fact, taking place. The U.S. Attorney submitted several transcripts of Lambert's suspicious conversations for the court's inspection. Again, the U.S. Attorney asserted that normal investigative techniques could not be used. The reason for this, it was explained, was because Lambert was a very cautious person who would be fearful of revealing any information to strangers, such as undercover FBI agents. His cautiousness had recently increased, Welsh noted, after he had become aware of an earlier FBI surveillance attempt. The application for extension was authorized by Assistant Attorney General Jensen. After reviewing the application and the supporting documents, the court approved the extension request. Two additional extensions were sought by the U.S. Attorney with Jensen's authorization. The court agreed to both extensions after examining several of the wiretap transcripts. On April 30, 1983, the FBI terminated the wiretaps.

On May 4, 1983, Judge Moynahan ordered that the recordings be sealed and

placed in the custody of the FBI's Louisville office. He further directed that the recordings be protected from the possibility of tampering or alteration and that their contents not be disclosed except pursuant to court order. This order was signed and then placed under seal.[1] The recordings themselves were delivered to the FBI's Lexington office, picked up at that office by Agent Joann Moxley and brought by her to the Louisville office. Moxley indicated that she marked each tape and kept an inventory of them. The tapes were stored in cartons and placed in a locked vault. Moxley testified that she maintained a log which showed the name of each person who entered the vault and how long they were inside. According to her log and her own recollection, the tapes remained in the vault and were never checked out by anyone.

Based on the information supplied by Hall, the wiretaps and other information obtained through the FBI's own investigation, the U.S. Attorney applied for a warrant, on April 19, 1983, to search Lambert's house and his vacation cabin. The application requested permission to search these sites for illegal drugs, equipment used to manufacture the drugs and documents relating to the sale and/or distribution of the drugs. An extensive affidavit was submitted in support of the application which detailed the information cited above as well as the FBI's own surveillance showing Lambert's frequent contacts and phone calls with suspected drug dealers. The application was approved by U.S. Magistrate Cook.

The FBI searched both houses on April 21, 1983. A tremendous quantity of materials was confiscated. The FBI conceded that its seizure was perhaps more exten-

sive than the warrant would appear to have authorized but explained that the seemingly unauthorized items were seized because its trained dogs had sniffed these items and indicated that drugs were present. Because of the dogs' reaction, the FBI explained, it confiscated these items in order to examine them in the crime lab to see if, in fact, they contained illegal drugs.

Defendants Lambert and Block were indicted on January 19, 1984. The indictment charged Lambert with: (1) conspiracy to distribute cocaine, methaqualone and marijuana in contravention of 21 U.S.C. § 846; (2) distribution of cocaine in contravention of 21 U.S.C. § 841; and (3) distribution of illegal drugs to a minor in contravention of 21 U.S.C. § 845. Block was charged with violations of §§ 841 and 846.

Various motions were filed by the defendants to suppress the evidence. The court rejected these motions. With regard to the extensive amount of arguably unauthorized evidence seized by the FBI during its search of Lambert's house, the court criticized the behavior of the FBI but decided against excluding the clearly authorized evidence. The court also ruled that Block lacked the requisite standing to object to the admission of the evidence.

After the court's rulings admitting the evidence, the defendants entered into an agreement with the government to plead guilty to one count of the indictment involving the distribution of controlled substances while reserving their right to appeal the court's evidentiary rulings. The court approved the agreements in June 1984. On July 17, 1984, the court sentenced both defendants to five years imprisonment. On that same day, the defendants filed their appeals.

---

1. The district court's order was not originally included in the appellate record. On March 8, 1985, the government moved to supplement the record by including this order. An affidavit from FBI Agent Welsh was submitted in support of the government's motion. In his affidavit, Welsh stated that he was present when the proposed order was given to the court for its consideration. According to Welsh's recollection, the court adopted the proposed order and placed it under seal. Welsh further explained that no copies were made of the order and that, consequently, a copy was not included in the appellate record. Appellant Lambert filed a response in opposition to the government's motion on March 14, 1985. The Circuit Clerk then ordered, on March 20, 1985, that the government's motion be referred to this panel. Pursuant to our authority under Fed.R.App.P. 10(e), we will grant the government's motion.

## II.

The district court's evidentiary rulings must be upheld on appeal unless they are clearly erroneous. *United States v. Coleman*, 628 F.2d 961, 963 (6th Cir.1980). In reviewing the court's rulings under this standard, our inquiry is limited to determining whether the rulings are supported by substantial evidence.

### A.

The defendants insist that the items taken by Diana Hall from Lambert's house and delivered to the FBI violated their Fourth Amendment rights and should, therefore, have been suppressed. Initially, we note that the Fourth Amendment proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official. *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971). We must, therefore, determine whether Diana Hall was acting as an agent for the government when she took the inculpatory evidence from the Lambert residence.

A person will not be acting as a police agent merely because there was some antecedent contact between that person and the police. *United States v. Coleman*, 628 F.2d at 965. Rather, two facts must be shown. First, the police must have instigated, encouraged or participated in the search. *Id.* Second, the individual must have engaged in the search with the intent of assisting the police in their investigative efforts. *United States v. Howard*, 752 F.2d 220, 227 (6th Cir.1985). While it is clear that Diana Hall acted with the requisite agent intent, the record fails to show that the FBI instigated, encouraged or par-

ticipated in her searches. Both Hall and FBI Agent Welsh expressly testified that the FBI never instructed or encouraged Hall to take items from Lambert's home. In fact, the record shows that she was told on several occasions that she should not take items from the house. Under these circumstances, Hall's search must be deemed to be a private search and, therefore, not within the purview of the Fourth Amendment.

Diana Hall's search and seizure is not brought within the scope of the Fourth Amendment simply because she brought the seized items to the FBI. As this court has previously held, "there is no seizure within the meaning of the Fourth Amendment when an object discovered in a private search is voluntarily relinquished to the government." *United States v. Coleman*, 628 F.2d at 966. Accordingly, we conclude that the district court did not err in admitting these items.[2]

### B.

The defendants contend that the information gathered from the FBI wiretaps should have been suppressed because the wiretaps were illegal. Specifically, they allege that the FBI and the U.S. Attorney failed to comply with several of the statutory requirements for the application and issuance of wiretaps contained in 18 U.S.C. §§ 2516 and 2518. First, they claim that the January 7, 1983 wiretap application was not properly authorized under § 2516 because Assistant Attorney General Jensen did not sign it. Even those applications which Jensen did sign were not properly authorized, the defendants maintain, because Jensen, himself, had never received the requisite authorization mandated by the statute. Second, the defendants argue that the applications did not contain the necessary findings required under §§ 2516 and 2518, including that other investigative methods could not reasonably have been

---

**2.** Given our conclusion that Diana Hall's actions were outside the scope of the Fourth Amendment, it is unnecessary for us to address defendant Block's contention that the court erred in ruling that he lacked the requisite standing to challenge the lawfulness of Hall's search and seizure.

used. Third, the need for the wiretaps was not sufficiently shown, defendants insist. Fourth, defendants allege that the FBI improperly failed to inform Judge Moynahan of precisely which rooms in Lambert's house it intended to place the listening devices. Finally, the government failed to comply with the sealing and custody requirements of § 2518(8)(a), the defendants contend.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, has established a comprehensive scheme for the regulation of government electronic surveillance, prohibiting all secret interception of communications except as authorized by the courts in response to applications from law enforcement officials. *Dalia v. United States,* 441 U.S. 238, 249, 99 S.Ct. 1682, 1689, 60 L.Ed.2d 177 (1979). Section 2516[3] provides that a wiretap application must be authorized by the Attorney General or by a specially designated Assistant Attorney General. On January 19, 1981, then Attorney General Benjamin Civiletti executed Order No. 931–81 designating, among others, the Assistant Attorney General in charge of the Criminal Division to authorize wiretaps in his absence. Soon after taking office, the new Attorney General, William French Smith, executed Order No. 934–81 which provided that, until a new Assistant Attorney General for the Criminal Division was appointed, the Assistant Attorney General for the Office for Improvement in the Administration of Justice would be specially designated to authorize wiretaps. Attorney General Smith's order declared that Civiletti's prior order remained in effect. Thus, when the new Assistant Attorney General for the Criminal Division took office, he was implicitly empowered, by virtue of the two orders, to authorize applications for wiretaps.

■ The statute does not require, nor did the above-cited orders provide, for the designation of a specific individual to authorize wiretaps. Rather, it is permissible for the Attorney General to designate a person by the office he or she holds. This designation will then apply to whomever holds this office in the future. *United States v. Votteller,* 544 F.2d 1355, 1358–9 (6th Cir.1976). When Lowell Jensen was appointed Assistant Attorney General for the Criminal Division, he was vested with the power to authorize wiretaps by virtue of the office he held. We therefore reject defendants' assertion that Jensen lacked the requisite authority to authorize the wiretaps in this case. *Accord: United States v. Camp,* 723 F.2d 741, 744 (9th Cir.1984); *United States v. Terry,* 702 F.2d 299, 311 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Robinson,* 698 F.2d 448, 452 (D.C.Cir.1983); *United States v. Wyder,* 674 F.2d 224, 226–27 (4th Cir.), *cert. denied sub nom. Mallory v. United States,* 457 U.S. 1125, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982).

■ While it is true that the January 7th application was not authorized by Assistant Attorney General Jensen, his authorization was not necessary in this instance. Section 2516(1) only requires this authorization on an application for "an order authorizing or approving interception of ... communications...." The January 7th application did not seek permission to intercept communications. It merely sought the court's permission to change the parties involved in installing the wiretaps. Our conclusion that the Assistant Attorney General's authorization is unnecessary is consistent with the purpose underlying § 2516(1). The requirement that a specially designated senior Justice Department official authorize wiretap applications "was designed to insure that *decisions to wiretap* were made by the named officials and did not reach into the lower echelons of command." *United States v. Cox,* 462 F.2d 1293, 1300

---

**3.** 18 U.S.C. § 2516(1) states, in relevant part:

The Attorney General ... or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal Judge of competent jurisdiction for ... an order authorizing ... the interception of wire or oral communications by the Federal Bureau of Investigation....

(8th Cir.1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974) (emphasis added). *See also United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974) ("The Act plainly calls for the prior, informed judgment of enforcement officers desiring court approval *for intercept authority,* and investigative personnel may not themselves ask a judge for authority to wiretap or eavesdrop. The mature judgment of a particular, responsible Department official is interposed as a critical precondition to any judicial order." [emphasis added]). This purpose was satisfied by Assistant Attorney General Jensen's authorization of the actual wiretap application. It is not necessary or practical that he be required to approve of the particular means by which the wiretap will be installed. *See Dalia v. United States,* 441 U.S. at 257, 99 S.Ct. at 1693.

██ Defendants further contend that the necessary findings required by §§ 2516 and 2518 were not made. Specifically, they allege that the government failed to show that normal investigative procedures had been tried and had proved unsuccessful. An application for a wiretap order must include "a full and complete statement as to whether other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Based upon this application, the court may grant the order if it determines that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). These provisions do not require that the police officials exhaust every conceivable non-wiretap investigative technique. All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investi-

gators' belief that such non-wiretap techniques have been or will likely be inadequate. *United States v. Alonso,* 740 F.2d 862, 868 (11th Cir.1984); *United States v. Webster,* 734 F.2d 1048, 1055 (5th Cir.1984). We must, therefore, determine whether the law enforcement officials and Judge Moynahan satisfied their respective obligations.

██ The requirements of §§ 2518(1)(c) and (3)(c) were satisfied in the instant case, we conclude. The affidavits in support of the wiretap application explained in great detail that other investigative measures could not reasonably be used because of Lambert's extreme (and correct) suspicion that his activities were being monitored and the fact that alternative investigative procedures, such as directly questioning Lambert and his associates, would likely alert the subjects to the presence and scope of the investigation. This was sufficient to satisfy the government's obligation under § 2518(1)(c). *See United States v. Woods,* 544 F.2d 242, 257 and n. 11 (6th Cir.1976); *United States v. Brown,* 761 F.2d 1272, 1276 (9th Cir.1985); *United States v. Wilkinson,* 754 F.2d 1427, 1433-4 (2d Cir.1985). The court took specific notice of the affidavit's explanation in its orders authorizing the wiretaps. This was sufficient to satisfy the court's duty under § 2518(3)(c).

██ Defendants also insist that the U.S. Attorney was required to disclose to the court the fact that it intended to place a listening device in Lambert's bedroom. We disagree. The wiretap application was required to include "a particular description of the ... location of the place where the communication is to be intercepted." 18 U.S.C. § 2518(1)(b)(ii). The application complied with this requirement by identifying the location of the Lambert house. The statute does not require the judge to approve the precise location in the house where each listening device will be placed. This is best left to the discretion of the law enforcement officials.[4]

---

**4.** As Judge Moore wisely explained:
[J]udges [should not] be presumed to have such familiarity with the ... premises in

which [listening devices] are to be installed that a court should be required in its order to specify ... the appropriate location of the

■ Next, defendants raise the argument that the U.S. Attorney failed to present evidence of the likelihood that one of the crimes listed in § 2516 was occurring at the Lambert residence. This argument is completely without merit. The statute permits the use of a wiretap to uncover evidence of "any offense involving ... the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marijuana, or other dangerous drugs ...", 18 U.S.C. § 2516(1)(e), or "any conspiracy to commit any of the foregoing offenses," 18 U.S.C. § 2516(1)(h). The U.S. Attorney's applications contained an overwhelming amount of evidence detailing the extensive drug activities at Lambert's house. The evidence offered was more than sufficient to satisfy § 2516.

Finally, we reject defendants' assertion that the sealing and custody requirements of § 2516(8)(a)[5] were not complied with. In essence, this subsection provides that the tape recordings from the wiretaps shall be made available to the judge, sealed under his directions and placed in the custody of whomever and wherever the court directs. The central purpose of these requirements, as the statute declares, is to "protect the recording from editing or other alterations." Judge Moynahan's May 4, 1983 order complied with these requirements in all respects. Further, the extensive safety precautions taken by FBI Agent Moxley, such as maintaining an inventory of the tapes and writing down the names of all persons who entered the vault where the tapes were stored, provided an additional safeguard that the tapes would not be edited or altered by anyone.

In summation, we find no merit in defendants' charge that the requirements of §§ 2516 and 2518 were not satisfied. The district court, therefore, properly overruled defendants' motions to exclude the wiretap evidence and the fruits of that evidence.

### C.

The defendants contend that the search of Lambert's home and vacation cabin was illegal because the affidavit in support of the search warrant failed to establish probable cause. We disagree.

■ In determining whether an affidavit establishes probable cause, the court must evaluate the affidavit under a "totality of the circumstances" standard:

> The task of the issuing magistrate is simply to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. [citation omitted].

*Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983). Notwithstanding the deference which must

---

bug.... Were this to be required, a judge, in consultation with law enforcement officers, might have to visit the premises to be entered and discuss ... the areas for installations. His order would then have to contain explicit directions as to how to proceed, with the risk that any deviation therefrom, created by unforeseen emergencies, would create a possibility of illegality. It would be most unseemly for the courts to invade the province of law enforcement agencies by assuming that their competence was greater than that of the agencies presumably skilled in their field. *United States v. Scafidi,* 564 F.2d 633, 640 (2d Cir.1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978).

**5.** 18 U.S.C. § 2518(8)(a) provides, in pertinent part:

> The recording of the contents of any wire or oral communication ... shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders....

be accorded to the magistrate's determination, however, if the information contained in the affidavit simply does not add up to probable cause, the warrant will be held invalid. *United States v. Savoca,* 761 F.2d 292, 296 (6th Cir.1985).

■ In the instant case, the government's affidavit in support of the search warrant contained ample factual allegations to establish probable cause. Most significantly, the affidavit detailed Diana Hall's eyewitness account of Lambert's extensive use of illegal drugs at his home and his meetings with persons who appeared to be drug dealers. The affidavit also mentioned the drugs and drug paraphernalia taken by Hall from Lambert's house and delivered to the FBI. The wiretap evidence indicated that Lambert was using and purchasing cocaine and was likely involved in drug dealing. These allegations were sufficient to establish probable cause to justify the search of Lambert's home. With regard to Lambert's cabin, the affidavit contained wiretap transcripts showing Lambert was in the process of moving his possessions, including his drugs, to the cabin. Diana Hall confirmed these moving plans by her own observation and from talking to several of Lambert's friends, the affidavit revealed. When viewed in conjunction with the evidence detailing the drug activities at his home, this evidence was sufficient to show that the probable cause extended to Lambert's cabin as well. We therefore conclude that the magistrate had a substantial basis for his probable cause findings and that the search warrants were properly issued.

Defendants contend that the FBI ignored the limitations contained in the warrant by seizing a substantial quantity of evidence which was outside the scope of the warrant. Given the FBI's "flagrant" disregard of the warrant, defendants argue, the district court should have suppressed all the evidence taken, including that which was admittedly within the scope of the warrant. Again, we find no merit to their contention.

■ The warrant authorized the FBI to search for illegal drugs, equipment used to manufacture the drugs, drug paraphernalia and all documents relating to the sale and distribution of the drugs. Admittedly, many of the items taken were not, on their face, the specific types of items authorized to be seized by the warrant. However, the FBI dogs trained to sniff for drugs indicated that drug residue was contained on these items. It was impractical for the FBI to remove such microscopic residue without also taking the items themselves. Thus, all of the items taken by the FBI were within the scope of the warrant, either because of the item itself or because of the drug residue contained on the item.

■ Even if, *arguendo,* these items were not covered by the warrant, suppression of all the items seized would not be mandated. Unlawful seizure of items outside a warrant does not alone render the whole search invalid and require suppression of all evidence seized, including that lawfully taken pursuant to the warrant. *Marvin v. United States,* 732 F.2d 669, 674 (8th Cir.1984); *United States v. Tamura,* 694 F.2d 591, 597 (9th Cir.1982). A flagrant disregard for the limitations of a search warrant might make an otherwise valid search an impermissible general search requiring the suppression of all evidence seized during the search. *Marvin v. United States,* 732 F.2d at 674–5; *United States v. Wuagneux,* 683 F.2d 1343, 1354 (11th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Heldt,* 668 F.2d 1238, 1259 (D.C. Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). Absent flagrant action, however, the items covered by the warrant will be admissible. *See Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 2214 n. 3, 81 L.Ed.2d 31 (1984); *United States v. Wuagneux, supra.* In the instant case, the FBI agents made a good faith effort to stay within the scope of the warrant. It was not unreasonable for them to rely on the indications made by their trained dogs that the items contained drug residue. Therefore, even if the agents did exceed the scope of the warrant,

it was not error for the court to admit the evidence which was clearly within the warrant's scope.

### III.

In conclusion, we find no reversible error in the arguments raised by the defendants. The judgments of conviction are affirmed.