**UNITED STATES of America,
Plaintiff,**

v.

**Brady MUSE, Jr., Defendant.**

**Case No. 09–20581.**

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 2, 2010.

Stephen L. Hiyama, U.S. Attorney's Office, Detroit, MI, for Plaintiff.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

DAVID M. LAWSON, District Judge.

On May 2, 2006, a federal magistrate judge issued a warrant authorizing agents of the Federal Bureau of Investigation to search "Suite 218" of a certain office building in Southfield, Michigan for evidence of fraud in connection with mortgage loan activity by three companies known as Collage Financial Services, Inc., Jem Marketing, Inc., and Challenge Mortgage, Inc. When they arrived, FBI agents soon learned that some of the documents they wanted to seize might be located in a separate suite, which displayed the sign for another business, Lumiere Business Services, Inc. and was designated as "Suite 218A." The agents gained entry into Suite 218A without any additional judicial authorization and seized documents there-

from belonging to defendant Brady Muse, who has filed a motion to suppress that is now before the Court. The Court held an evidentiary hearing on June 28, 2010, and thereafter allowed the parties to file supplemental briefs. The Court now finds that the search of Suite 218A exceeded the scope of the search warrant, no exigent circumstances justified the resulting warrantless search, the FBI agents did not act in good faith when they disregarded the limitation plainly stated on the fact of the warrant, and the evidence seized from Suite 218A must be suppressed. Therefore, the Court will grant the defendant's motion to suppress evidence.

I.

Sometime prior to 2006, government agents suspected that defendants Brady Muse, Melvin Johnson, and Curtis Johnson were involved in procuring fraudulent mortgage loans by recruiting straw home purchasers and then furnishing phony documents, such as employment verification, to construct a false credit history that would qualify the "purchasers" for the loans. According to the search warrant affidavit filed in this case, FBI agent Claudia Link spearheaded the ensuing investigation. Working with a cooperating witness, Link says she learned that Melvin Johnson and Curtis Johnson were operating this enterprise in offices located at "16250 Northland Drive, Suite 218, Southfield, Michigan." Mot. to Supp., Ex. 2, Attch. B, ¶ 4. They were conducting business under the business names of Jem Marketing and Challenge Mortgage.

Through review of public filings and other investigation, Link was able to confirm that the Johnson brothers and their businesses were located at the 16250 Northland Drive office building, although Gem Marketing had filed an incorporation document that listed Suite 106 as its address.

Nonetheless, Link went to the office building on February 22, 2006 and proceeded to Suite 218, where she met the Johnsons and Brady Muse. She learned that Muse operated a different company, Collage Financial, but that it was co-located in Suite 218 with Jem Marketing.

Link's investigation had focused on certain residential properties in Detroit that allegedly had been purchased by a Bertha Powell through loans brokered by Gem Marketing. Link interviewed Powell in August 2005, who told her that despite the representations in the various loan packages,

> she never worked for Collage Financial Services and never received the earnings statements or W–2s from Collage Financial Services that were submitted as part of the loan packages to [the lender].... Powell said that neither Curtis Johnson nor Melvin Johnson asked her about employment when she met with them concerning the loans. Powell also advised that she met with Brady Muse at the office of Melvin Johnson and Curtis Johnson.

Mot. to Supp., Ex. 2, Attch. B, ¶ 15. According to closing documents, a company called First United Realty was to receive a commission for brokering the loan on one of the Powell purchases. Records showed that Muse formed that company and listed 16250 Northland Drive, Suite 362 as the address. However, when link went back to that location in April 2006, a different business was in that suite.

Link's affidavit describes other real estate transactions brokered by Melvin and Curtis Johnson in which the named buyers stated that they had no knowledge of the real estate transactions and were not the true purchasers. Some of them stated that their identities had been stolen. Through interviewing witnesses, including Bertha Powell, Link stated that she learned the following about 16250 Northland Drive, Suite 218:

49. The CW [cooperating witness] described Suite 218 at 16250 Northland Drive., Southfield, Michigan, as containing several offices. Curtis and Melvin Johnson shared one of the offices. In their office were two desks with computers and two filing cabinets.

50. Bertha Powell informed me that the closings for loans to purchase the houses at 22115 Karl, Detroit, Michigan, and 15866 Turner, Detroit, Michigan both took place at the office of Curtis and Melvin Johnson at 16250 Northland Drive, Suite 218, Southfield, Michigan. Powell advised the two men shared an office but each had his own computer at his desk. The closings took place in a separate room within the office space at 16250 Northland Drive that contained four-door, metal filing cabinets. Powell also stated Brady Muse had his own office at 16250 Northland Drive, Suite 218. Muse's office also contained a desk with a computer. Powell advised there was also a third office, which was the loan processor's office, that held a desk, a computer, and a credenza. (Powell also related that the directory for 16250 Northland Drive contained no listing for Suite 106, and that she observed that Suite 106 appeared to be empty.)

51. Jessica Cameron and Jakeema Roberson advised they had both been to the office of Melvin and Curtis Johnson at 16250 Northland Drive, Suite 218, Southfield, Michigan, to attend mortgage closings brokered by the two men. They stated Melvin and Curtis Johnson shared an

office that contained two desks and two computers. They also advised there were at least two other offices within the suite; Nina Diederichsen, a loan processor at Challenge Mortgage, used one of the two offices.

Mot. to Supp., Ex 2, Attch. B, ¶ 49.

On April 12, 2006, agent Link arranged for Powell and another cooperating witness, Bridget Williams, to visit Suite 218 while wearing a recording device. The transcript of the conversation indicates that when Williams asked the receptionist at Suite 218 for Brady Muse, she was told that Muse had moved "next door. The next door on the right.... He changed offices.... This is a different opening." Mot. to Supp., Ex. 5 at 1.

On May 2, 2006, agent Link applied for and obtained a search warrant to search "16250 Northland Drive, Suite 218, Southfield, Michigan" for "[a]ll records ... relating to any mortgage loan involving, in any capacity, Challenge Mortgage, Challenge Financial Investors Corp. (CFC), Jem Marketing, Jem Marketing Realty, Jem Processing, First United Realty, Collage Financial, Melvin Johnson, Curtis Johnson, or Brady Muse....". Mot. to Suppress, Ex. 1, Search Warrant, attachment A. Suite 218A was not mentioned in the search warrant or affidavit. Agents executed the search warrant the same day.

Agent Link testified at the hearing that she believed that Brady Muse's office adjoined the offices of Melvin and Curtis Johnson. She testified that Powell had told her that Muse's office was part of Suite 218, connected by an adjoining hallway. Powell provided Link with a sketch of the suite's floor plan drawn by her daughter and fellow witness, Bridgitte Williams (hearing Exhibit 8). Link said that Powell told her that Muse had a separate office but never told Link there was a separate number on Muse's office door.

When she arrived at the office building on May 2, 2006 with other agents to execute the search warrant, Link was surprised to see that Suite 218A was a separate office suite with its own entrance accessible only from the common hallway. There was no access to it from Suite 218; the back hall entrance from Suite 218 had been closed off. The front door to Suite 218A was also locked, and Link noticed a sign on the door that read "Lumiere Business Services—Suite 218A."

According to the owner, Charles Lechner, the office building at 16250 Northland Drive consists of 180,000 square feet, four floors, and 70 to 76 suites. There were four building entrances on the main floor, but only one contained a directory. Marquees also were posted on every floor by the elevators and signs were posted on every door. Lechner testified that he first met Muse in 2003 or 2004 and knew that Muse shared office space with Melvin Johnson until sometime in 2004 or 2005, when they separated the office spaces. At first, Lechner had his staff remove the door handles and put plates on the door that separated Muse's office suite from the rest of Suite 218. Later he covered the door opening with drywall. After these alterations, Lechner testified that the only access to Suite 218A was through the common hallway. In 2005, Lechner also ordered and affixed signs to Suite 218A and to the building directory, although he was not certain exactly when the signs went up.

According to the drawings submitted at the hearing, Suite 218 originally consisted of eleven rooms with two doors that opened into the common hallway. Corinne Swain, Muse's receptionist in 2006, testified that after the suites were separated, Suite 218A was comprised of five rooms, all of which could be accessed only though the single common hallway door.

It is obvious that Link harbored doubts about her authority to search Suite 218A under the search warrant she had obtained. She testified that she knew Suite 218A was "separate and distinct" from Suite 218 when she executed the warrant, the search warrant listed only Suite 218 as the premises to be searched, and she knew there was no way to enter Suite 218A except through a separate, locked entrance. She asserted that she intended to search for and seize documents connected with Collage Financial and Brady Muse, however.

Faced with that doubt, agent Link contacted an Assistant United States Attorney, who told her, remarkably, to proceed with the search of Suite 218A without obtaining additional judicial authorization. So that is what Link and her colleagues did. Link ordered a building maintenance person to unlock the door of Suite 218A. (Suite 218 was occupied and the door was unlocked when the agents arrived.) And they seized documents and computer records from both Suite 218 and 218A. Link testified she thought she had the authority to do so under the warrant.

## II.

### A.

■ The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. am. IV. Defendant Muse does not contend that the search warrant issued in this case was invalid, unsupported by probable cause, or vague in its description of the place to be searched or the things seized. To the contrary, he says that the warrant was specific in its authorization to search Suite 218, and the government agents proceeded beyond those clear limitations when they entered and searched Suite 218A. The gov-ernment believes that the warrant should be read to allow the search of Suite 218A because agent Link had probable cause to believe evidence of the mortgage fraud scheme would be found there.

The Supreme Court has stated:

The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one "particularly describing the place to be searched and the persons or things to be seized." The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.

*Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). When officers "flagrant[ly] disregard ... the limitations of [the] search warrant," *United States v. Lambert,* 771 F.2d 83, 93 (6th Cir.1985), "[a] search pursuant to a valid warrant may devolve into an invalid general search." *United States v. Garcia,* 496 F.3d 495, 507 (6th Cir.2007).

■ Under current Sixth Circuit law, "an officer flagrantly disregards the limitations of a warrant only where he 'exceed[s] the scope of the warrant *in the places searched*' (rather than the items seized)." *Ibid.* (citing *Waller v. Georgia,* 467 U.S. 39, 43 n. 3, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)). As the court explained, "[t]he test for determining if the officers engaged in an impermissible general search is whether their search *unreasonably* exceeded the scope of the warrant." *Ibid.* (citing *Brindley v. Best,* 192 F.3d 525, 531 (6th Cir. 1999)).

When a single structure houses several discrete units, the terms of the search warrant will prescribe which units within that structure may be searched lawfully. The government does not claim here, nor could it with any credibility, that the warrant authorized the search of all the office suites in 16250 Northland Drive. "For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses." *United States v. Votteller*, 544 F.2d 1355, 1363 (6th Cir.1976) (quoting *United States v. Hinton*, 219 F.2d 324, 325–26 (7th Cir.1955)); *see also United States v. Gonzalez*, 697 F.2d 155, 156 (6th Cir.1983) (noting that "[i]t is settled that where ... a structure is divided into more than one unit, probable cause must exist for each unit"). The search warrant here was limited to Suite 218; it could not be read reasonably to authorize the search of any other suite of offices in the building.

There are cases in which searches have been upheld when rooms or outbuildings not specifically described in a search warrant have been searched. For instance, in *United States v. Stefonek*, 179 F.3d 1030 (7th Cir.1999), the search warrant authorized the search of office suites 101, 102, and 103 in an office building, but a significant portion of the evidence was seized from suite 104, which was adjacent to suite 103. The court held that the agents' conduct was reasonable because the door to the businesses' office was marked "Suite 101," and the division of the interior into separately numbered suites was obscure. Similarly, in *United States v. Heldt*, 668 F.2d 1238 (D.C.Cir.1981), the court held that the search of a "free-standing penthouse room, or hut, built on the top of a roof" extending outside the "suite of offices" named in the search warrant was within the scope of the warrant, even though the individual named in the warrant did not work in the penthouse room.

The court found that the area reasonably could have been viewed by officers conducting the search as constituting part of the suite of offices named in the warrant, because access to the penthouse was available through the French doors in one of the office suites included in the warrant, and the "hut" outside the doors of the office suite appeared to be part of that suite.

Compare those cases to *United States v. King*, 227 F.3d 732 (6th Cir.2000), where the court found that officers exceeded the scope of their warrant by searching the basement of a two-unit dwelling when the individual named on the warrant only resided in one of the units, and the second unit was occupied by a family member not named in the warrant. The court determined that the officers' actions "flagrantly disregard[ed] the limitations of the warrant" because "the area was not 'common' area ... and the nature of the location of the basement in this two-unit dwelling *should have put the agents on notice* that the search warrant did not include this area." *Id.* at 751 (emphasis added).

In *United States v. Shamaeizadeh*, 80 F.3d 1131 (6th Cir.1996), the court held that a warrant to search one residence within a building could not authorized the search of basement apartments in that same building, even where the residents of those apartments were named in the warrant. In that case, the officers executing the warrant had actual notice that the residential building in question was divided into two apartments before they actually searched the second apartment, which was not specified in the warrant. The court also found that the officers had constructive notice that the building was comprised of two separate residences because the living conditions at the time of the search indicated that two of the defendants exercised exclusive control over the basement

floor apartments. The officers discovered that the door connecting the upper floor and the basement floor was locked, and they had been told by their informant, also a tenant of the building, that access to the basement by main floor tenants was restricted. The court distinguished that case from *United States v. Whitney*, 633 F.2d 902 (9th Cir.1980), in which the search warrant designated the place to be searched as a single residence that in fact was comprised of two separate apartments. In *Whitney*, the court found that the warrant authorized a search of the entire building because " 'there [was] no evidence that the living arrangement was ever described as one involving two separate apartments.' " *Shamaeizadeh*, 80 F.3d at 1139 (quoting *Whitney*, 633 F.2d at 908). Therefore, the living conditions in *Whitney* failed to put the police on constructive notice that the building contained more than one residence.

The government attempts to distinguish *United States v. King*, stating that "[t]he special rules concerning multi-unit residences are not applicable to the facts in the instant case." Gov't Suppl. Br. at 7. *King*, however, represents mainstream Fourth Amendment law and articulates no "special rules." The government also notes that neither the warrant nor the affidavit in *King* mentioned the basement apartment and the officers were not aware that the building included a basement or which of the defendants had access to this space; but the government does not explain how these facts distinguish *King* from the present case.

The government also insists that when agent Link obtained the search warrant from the magistrate judge, she had no knowledge that Suites 218 and 218A were separate units. Whether she should have been aware of that fact is a debatable point, especially in light of the recorded conversation by the cooperating witnesses just two weeks before the warrant was obtained in which the informant stated that Brady Muse had "changed offices" and the new one had "a different opening." Mot. to Supp., Ex. 5 at 1. But that is inconsequential under the present facts. The reasonableness of the agents' conduct must be assessed "not in light of facts discovered upon execution of [i.e., signing] the search warrant, but rather in light of the information available to the officers at the time they acted." *Garrison*, 480 U.S. at 81, 107 S.Ct. 1013. The circumstances of the search in *Garrison* provides a good lesson here. In that case, the officers obtained a warrant to search the third floor of an apartment building believing that only one apartment existed on that floor. However, after discovering contraband in Garrison's apartment on the third floor, the officers became aware that the floor was divided into two separate apartments. Once the officers became aware of the separate apartments, they discontinued the search. The Court sustain the seizure of Garrison's contraband because it occurred *before* the officers' discovery of the separate units. The Court refused to invalidate the search warrant as overbroad. *Id.* at 85, 107 S.Ct. 1013 ("Just as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant."). The Court cautioned however: "Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant." *Ibid.*

The Court believes that the facts in this case are much closer to *King* and

*Shamaeizadeh* than to *Stefonek,* and *Heldt.* Certainly, "[a]n expectation of privacy in commercial premises ... is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). But the difference between the residences in the former cases and the offices in the latter cases is not the distinguishing feature. "For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States,* 389 U.S. 347, 351–352, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (citations omitted).

Rather, the point of distinction of these cases is the information available to the officers at the time they conducted their search. There is no proper way a reasonable person could conclude that Suites 218 and 218A were part of the same unit on May 2, 2006. Suite 218A was distinct, different, separate, discrete, and clearly identified as such. There was no access from one suite to the other. Entry to Suite 218A was restricted by a separate lock and key. The signage was distinct. The name on the door identified a business that was not the focus of the investigation or even mentioned in the search warrant affidavit. The record shows that the agents were not only on constructive notice of the separateness of the units, they had actual notice, which prompted a call to the AUSA.

Unlike the officers in *Garrison,* the agents in this case did *not* discontinue their search of Suite 218A when they discovered it was a separate unit. They went ahead anyway, when they could have easily sought and likely obtained judicial authorization to search the separate unit, simply by providing some additional information to the magistrate judge who had issued the search warrant only hours earlier. The search warrant issued in this case did not authorize the search of Suite 218A.

## B.

Because the search of Suite 218A was beyond the plain terms of the search warrant, that search was, by definition, warrantless. The Supreme Court has consistently held that in the criminal context, warrantless searches are *per se* unreasonable unless they fall within a few specifically established and well-delineated exceptions. *Payton v. New York,* 445 U.S. 573, 585–86, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Katz,* 389 U.S. at 357, 88 S.Ct. 507. Those exceptions include the seizure of a fleeing suspect, *Warden v. Hayden,* 387 U.S. 294, 298–300, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), prevention of the imminent destruction of evidence, *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), searches incident to a lawful arrest, *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and consent, *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government offers no evidence of any such circumstances and the records suggests none. The search of Suite 218A, therefore, must be deemed unreasonable.

## C.

■ The government argues that even if the search of that suite was not authorized by the warrant, the agents acted in good faith and the evidence should not be suppressed under the rule in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). One might question whether the rationale of *Leon* applies in

the present situation. Under *Leon*, the justification for the exclusionary rule is undermined when officers seize evidence pursuant to a defective search warrant they believe in good faith to be valid. *See id.* at 918, 104 S.Ct. 3405 ("If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, ... it must alter the behavior of individual law enforcement officers or the policies of their departments.... We have frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment."). In this case, there is no challenge to the validity of the search warrant. Instead, the Court has found that the agents violated the Fourth Amendment because they *"unreasonably* exceeded the scope of the warrant." *Garcia*, 496 F.3d at 507. As noted above, "unreasonableness" results when "an officer flagrantly disregards the limitations of a warrant ... [by] exceed[ing] the scope of the warrant *in the places searched." Ibid.* (citation omitted). It is difficult to find good faith in a flagrant disregard of a search warrant's limitations.

Nonetheless, the court in *King* considered a claim of good faith when the officers exceeded the scope of a valid warrant. The court dismissed the government's argument, noting that "[a]lthough it is true that the warrant was not facially deficient as applied to Defendant's downstairs unit, it is also true that the warrant did not reference the basement area, and the agent was aware of the warrant's limitations. The agent's assertions that the basement was included in the common area of Defendant's downstairs unit of this two-family dwelling is not reasonable under these facts." *King*, 227 F.3d at 754.

In considering the good-faith exception to the exclusionary rule, the circumstances in the present case are virtually identical to those in *King*, except one: the agent here sought advice from an AUSA. However, that does not demonstrate good faith or help the government. The government attorney here was part of the investigative team. His conduct—and the bad advice given to the agents—is attributable to the government itself. The AUSA was hardly neutral and detached, so consultation with him could not advance the purposes of the Fourth Amendment. The point of the warrant requirement is to channel government actors toward judicial officers when the government seeks to engage in conduct that may trench upon individual rights. *See Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) ("The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."). When the agent realized that the search warrant did not authorize the search of Suite 218A—which occurred to her *before* she searched those premises and seized items from there—she should have turned to the magistrate judge. The *Leon* exception does not save the search of Suite 218A.

### III.

The Court concludes that the Search of Suite 218A exceeded the scope of the search warrant issues in this case. The search of that suite was unreasonable, and the evidence seized must be suppressed.

Accordingly, it is **ORDERED** that the defendant's motion to suppress evidence [dkt. # 43] is **GRANTED.**

It is further **ORDERED** that items seized from Suite 218A on May 2, 2006 may not be introduced in evidence at trial against defendant Brady Muse.