RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0278p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

Nos. 17-5538/5544

*v.*

CHRIS FOLAD (17-5538) and KHALED FATTAH (17-5544),

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:14-cr-00168-1—Aleta Arthur Trauger, District Judge.

Argued: November 29, 2017

Decided and Filed: December 11, 2017

Before: GILMAN, SUTTON, and STRANCH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Cynthia A. Sherwood, SHERWOOD BOUTIQUE LITIGATION, PLC, Nashville, Tennessee, for Appellant in 17-5538. Richard Lewis Tennent, BELL, TENNENT & FROGGE, PLLC, Nashville, Tennessee, for Appellant in 17-5544. Amanda B. Harris, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Cynthia A. Sherwood, SHERWOOD BOUTIQUE LITIGATION, PLC, Nashville, Tennessee, for Appellant in 17-5538. Richard Lewis Tennent, BELL, TENNENT & FROGGE, PLLC, Nashville, Tennessee, for Appellant in 17-5544. Amanda B. Harris, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Henry Leventis, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

SUTTON, Circuit Judge.   Best we can tell, the crime at issue in this case and the issue prompted by it are unique.

The crime:  Individuals reprogrammed ATMs to dispense $20 bills for each $1 they were supposed to dispense.  Requesting $40 at a compromised ATM thus would deliver forty $20 bills instead of two.  All told, the artful technicians extracted from the ATMs more than $600,000 that did not belong to them.  The ATMs were owned by a company that does business in Tennessee, infelicitously named SafeCash Systems.  SafeCash investigated the crimes and found evidence that a former employee who serviced the machines, Chris Folad, and his friend, Khaled Fattah, engineered the scheme.  They turned the information over to the government, prompting several criminal convictions, one-year sentences for Folad and Fattah, and a predictable restitution order.

The issue:  After the scheme had ended and after SafeCash, the owner of the ATMs, had determined what had happened, SafeCash replaced seventeen of the relevant eighteen ATMs in response to a federal regulation requiring that they be accessible to individuals with sight impairments.  That amounted to the destruction of potentially exculpatory evidence, Folad and Fattah claim, and thus violated their due process rights.  For the reasons that follow, we affirm the convictions and sentences.

I.

SafeCash owns and operates ATM machines in Nashville and Memphis.   Although SafeCash stocked its machines with only $20 bills, the machines were capable of dispensing different denominations.  Taking advantage of that capability required an ATM technician to log on to the machine with the master passcode, reprogram the denomination code, and replace the $20 bills with bills of the new denomination.

In March 2010, SafeCash discovered that someone had reprogrammed one of its machines to dispense $1 bills without replacing the $20 bills with singles.  This meant that the

machine thought it was dispensing $1 bills when in truth it was dispensing twenties. Requesting $40 from the ATM would therefore net forty $20 bills for a total of $800. In each instance, the perpetrators made several $40 withdrawals before covering their tracks by reprogramming the machine's denomination code back to $20 bills.

SafeCash opened an internal investigation. Security footage suggested that Chris Folad (a former SafeCash ATM technician) and Khaled Fattah (his friend) might be the culprits. Comparing the ATM logs with bank records obtained from the police suggested the same thing. Folad and Fattah's bank records also revealed that they made suspicious withdrawals from seventeen other SafeCash ATMs. In some instances, they withdrew $6 and $13, amounts that were impossible to withdraw without reprograming the denomination codes. In another instance, they used seven different debit cards to make twenty $40 withdrawals in a single day. And in yet another instance, they made five withdrawals in four minutes from the same ATM. On top of that, the bank records revealed that Folad and Fattah used thirteen different debit cards and nine different bank accounts (including a joint account) to withdraw money from SafeCash ATMs.

SafeCash directed its employees to check the ATM logs to determine whether the withdrawals were fraudulent. Because the ATMs stored a limited number of transactions, employees could not find log entries for many of the suspicious withdrawals. But they did locate some of the log entries from four of the ATMs and printed out some of those records. They provided this information to federal law enforcement officials in 2010.

Soon after SafeCash concluded its internal investigation, the Department of Justice issued new regulations under the Americans with Disabilities Act. Those regulations required ATM operators to ensure that visually impaired customers could access their machines and obligated them to refit their ATMs with headphone jacks. SafeCash determined that it was more cost effective to purchase new ATMs than to refit the old ones. By 2015, SafeCash had replaced seventeen of the eighteen ATMs involved in the fraud. The one ATM that SafeCash did not replace was a newer model that already complied with the regulations.

The government indicted Folad and Fattah in October 2014. The pair moved to dismiss the indictment. The ATMs, they argued, contained exculpatory evidence, and SafeCash's decision to replace the ATMs violated their due process rights.

After conducting an evidentiary hearing, the district court denied the motion. The jury convicted Folad and Fattah on all counts after a three-day trial. The court sentenced them to one-year sentences and imposed a joint and several restitution order in the amount of $616,246.

II.

Folad and Fattah make one argument on appeal: The district court should have dismissed the indictment because SafeCash destroyed exculpatory, or at least potentially exculpatory, evidence when it replaced the ATMs.

The first problem with this argument is that SafeCash, not the government, made the decision to replace the machines. The government had nothing to do with it. The Due Process Clause—"No person shall . . . be deprived of life, liberty, or property, without due process of the law"—applies to action by the government, not action by private entities. *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 166 (1978). No precedent from the United States Supreme Court or this Court supports the idea that the government violates a criminal defendant's due process rights when a *private party*, with no support from the government and no inducement by the government, fails to preserve relevant evidence.

Folad and Fattah instead borrow from the teachings of search-and-seizure cases arising under the Fourth Amendment and confession cases arising under the Fifth Amendment. In the Fourth Amendment context, we have held that the government might violate a defendant's rights by "instigat[ing]" or "encourag[ing]" a private party to search a defendant on its behalf. *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985). In the Fifth Amendment context, courts have held that the government might violate a defendant's rights by coercing or encouraging a private party to extract a confession from a criminal defendant. *See, e.g.*, *United States v. Garlock*, 19 F.3d 441, 443–44 (8th Cir. 1994). But these cases offer no aid to the defendants here. No evidence shows that the government coerced or instigated or encouraged SafeCash to replace the ATMs, or indeed knew SafeCash planned to do so.

Even if we overlooked this problem and even if for the sake of argument we treated SafeCash as an agent of the Federal Government, the claim would fail all the same. The Due Process Clause prohibits the government from destroying evidence in a criminal case under specific circumstances. Of import here, it makes a difference whether the evidence was (1) apparently exculpatory at the time it was destroyed or (2) only "potentially useful" at the time it was destroyed. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). The failure to preserve the former violates due process regardless of the government's good or bad faith. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). But destruction of the latter offends due process only if done in bad faith. *Youngblood*, 488 U.S. at 57–58.

Neither line of precedent supports Folad and Fattah. The defendants have not shown that the ATMs contained apparently exculpatory evidence. So far as the record shows, the ATMs were more likely to confirm their guilt than to establish their innocence. Folad and Fattah's bank records showed that they made withdrawals in suspicious amounts ($6 and $13) and in suspicious circumstances (multiple withdrawals with different debit cards from the same ATM on the same day). The ATM logs likely would have confirmed the fraudulent nature of those withdrawals.

The defendants fare no better under the second test because they have not shown that the government violated their due process rights by destroying "potentially useful" evidence in bad faith. No evidence shows, or even suggests, that SafeCash or the government agents acted in bad faith.

SafeCash, the victim of the fraud, understandably conducted an internal investigation to find out what had happened. After they figured out the fraud and who did it, they turned over the results of their investigation to government agents. The government then used that information to prosecute Folad and Fattah. When SafeCash decided to replace the ATMs, the decision had nothing to do with this investigation or this prosecution. The company made the change to comply with new federal regulations under the Americans with Disabilities Act. Nor were federal prosecutors involved in the decision or for that matter aware of it. The record thus reveals no "official animus" or "conscious effort" on the part of the government or SafeCash "to suppress exculpatory evidence." *California v. Trombetta*, 467 U.S. 479, 488 (1984).

Folad and Fattah challenge these conclusions on several grounds. They first insist that the ATMs contained exculpatory evidence—that they should prevail, in other words, under the *Brady* test. SafeCash's ATMs, they point out, could dispense a maximum of 40 individual bills. And bank records showed that some of Folad and Fattah's withdrawals were for $60 and $100. These withdrawals, they argue, must therefore be legitimate, and the ATM logs would have confirmed as much. But evidence that the defendants (or their family members) made *some* legitimate withdrawals over the four-month period of the scheme does not undermine the evidence of their guilt. Some legitimate withdrawals do not establish the innocence of other withdrawals.

Folad and Fattah next argue that the ATMs might have provided exculpatory evidence for *sentencing* purposes. They point out that proof that the $60 and $100 withdrawals were legitimate could have changed the "total loss amount" used to calculate their recommended sentencing ranges under the Sentencing Guidelines. But that is not so. The record shows that the government *already excluded* the $60 and $100 transactions from its calculation of the total loss amount. R. 115 at 151; R. 158 at 43.

Nor is this the defendants' only problem on this score. The remedy for failing to preserve evidence that is relevant for sentencing would be a new sentence, *see Cone v. Bell*, 556 U.S. 449, 473–76 (2009), not the relief they seek: dismissal of the indictment. The defendants have not challenged their sentence, perhaps because the district court gave them a significant discount on the recommended guidelines range—a 12-month sentence instead of the recommended 37-month sentence at the low end of the range.

The ATMs, they add, might have revealed other exculpatory evidence: software upgrades that would have prevented the fraud; proof that ATM journals did not have limited storage capacities; and "discrepancies" in SafeCash's records and proof that SafeCash lied about why it replaced the ATMs. But none of these possibilities shows that the ATMs contained materially exculpatory evidence. At most, they raise the possibility of helpful evidence or "potentially exculpatory" evidence. That does not suffice under the *Brady* test.

The defendants argue in the alternative that the government and SafeCash acted in bad faith and thus satisfy the prerequisites for relief under the "potentially exculpatory" *Youngblood* test. Proof that the government acted in bad faith, they say, flows from the reality that it delegated investigatory duties to SafeCash and that the company had an incentive to inflate its losses (and hide relevant evidence) to secure a greater insurance payout. But the record shows, and the district court found, that SafeCash received the insurance payment *before* it replaced most of the ATMs. R. 90 at 125. And nothing in the record suggests that the insurance company's willingness to pay depended on the government's ability to convict. SafeCash did not replace the ATMs to hinder Folad and Fattah's defense or to obtain a greater insurance payment. SafeCash replaced the ATMs to ensure that the machines complied with federal regulations.

Other evidence of bad faith, claim the defendants, arises from the reality that it took from 2010 (when SafeCash discovered the fraud) until 2014 for the government to indict them. That is a fair point. But it submits to a fair response. The district court considered this issue at the evidentiary hearing. After hearing the evidence, the district court found that there were legitimate reasons for the delay, such as the government's resource constraints and its need to build the case for trial. The defendants have not shown that these findings are clearly erroneous. On this record, the defendants have not shown bad faith.

Folad and Fattah offer one last rejoinder. The Ninth Circuit, they point out, has held that a private company's "bad faith failure to collect potentially exculpatory evidence" violates due process. *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989). But even if a bad faith failure to collect potentially exculpatory evidence violates due process (an issue we need not resolve today), the defendants must still show that the failure to collect evidence resulted from bad faith. They have not done so.

For these reasons, we affirm.